1
2
3
4
5
6                    IN THE UNITED STATES DISTRICT COURT

7                    FOR THE NORTHERN DISTRICT OF CALIFORNIA

8
9
10   ANTHONY JOHN SULLY,                           No. C 92-00829 WHA

11          Petitioner,                            **CAPITAL CASE**

12      v.
                                                   **ORDER GRANTING**
13   ROBERT L. AYERS, JR., Warden of               **MOTION FOR**
     California State Prison at San Quentin,       **SUMMARY JUDGMENT**
14
15          Respondent.
     _____/
16
17                              **INTRODUCTION**

18          In this death-penalty federal habeas action, the six murders in question occurred as long

19   as a quarter-century ago.  The death verdict was rendered 21 years ago.  Defense counsel is now

20   deceased.  Respondent has filed a motion for summary judgment on all remaining claims

21   (Docket no. 203).  A hearing was held April 2, 2008.  For the reasons discussed below,

22   respondent's motion is **GRANTED**.

23                              **STATEMENT**

24          The following recitation of the factual background of this case is based on the decision

25   of the Supreme Court of California rejecting petitioner's direct appeal, *People v. Sully*, 53 Cal.

26   3d 1195 (1991), as well as the transcript of petitioner's trial.  The state court's factual

27   determinations are presumed to be correct pursuant to 28 U.S.C 2254(e)(1).

28          Petitioner was a police officer for the City of Millbrae from 1967 until 1974.  On leaving

     the service at age thirty, he established an electrical-contracting business in a warehouse in

United States District Court

For the Northern District of California

1    Burlingame.  The front of the warehouse served as his personal residence.  Before committing

2    the crimes at issue in this case approximately nine years later, petitioner invested money in an

3    escort service and regularly used prostitutes' services, frequently subjecting them to violence.

4    He also regularly freebased cocaine.

5           In 1986, a San Mateo County jury convicted petitioner of six counts of first-degree

6    murder with a special circumstance of multiple murder.  Death was the sentence.  Evidence at

7    trial established that petitioner killed five women and one man — Gloria Fravel, Brenda

8    Oakden, Phyllis Melendrez, Michael Thomas, Barbara Searcy and Kathryn Barrett — in a series

9    of horrific episodes involving prostitution and cocaine use.  The evidence further established

10   that petitioner committed violent acts against Louisa Garcia, Monica Tafoya and Diane

11   Armstrong.

12          In January 1983, Kelli "Angel" Burns, a prostitute, brought Louisa Garcia, an aspiring

13   model, to petitioner's warehouse to have sex with him.  When Garcia realized the purpose of

14   the visit and refused, petitioner, who was freebasing cocaine, threatened to torch her face if

15   she did not perform oral copulation.  Garcia acquiesced and then attempted to escape.

16   Petitioner, assisted by Burns, caught her and severely beat her until her face "looked like two."

17   Finally, he ordered Burns to take "that bitch out of here."  Burns then deposited Garcia near the

18   San Francisco airport.

19          Petitioner encountered Gloria Fravel through his companion and partner-in-crime,

20   Tina Livingston, whom petitioner had met previously when she was a partner in an escort

21   service.  Fravel worked for Livingston as a prostitute.  One Friday afternoon in February 1983,

22   Livingston and Burns picked up Fravel and transported her to petitioner's warehouse, ostensibly

23   to pick up camping equipment.  When they arrived, petitioner asked her for a date.  When she

24   declined, he slapped her and told her to go to the back of the warehouse.  Petitioner gagged

25   and handcuffed her, and suspended her from the ceiling.  He had sex with her over the course

26   of the weekend.  At one point, petitioner placed her on a bed, free-based cocaine and brutally

27   sodomized her.  Her gag fell off and she began screaming.  Livingston and Burns attempted

28   to silence her by tightening a hangman's noose around her neck.  Petitioner intervened.

**United States District Court**
For the Northern District of California

1   While Burns held a pillow over Fravel's head, he put his foot against the back of her neck

2   and jerked on the noose.  Fravel's body went limp and fluids spilled out.  With the help of

3   Livingston and Burns, petitioner put Fravel's body in plastic and put it in a car.  Burns and

4   petitioner then drove away to dispose of her body.  Petitioner later told Livingston that Fravel

5   had not, in fact, been dead when she was removed from the warehouse.  He had to pull the car

6   over to the side of the road and hit her with a hatchet.  She bled profusely.  Petitioner dumped

7   her body on Skyline Boulevard.  He later read a newspaper story about the discovery of Fravel's

8   body.  The article stated that the body was found by a butcher.  Petitioner found this

9   humorously appropriate.

10          Shortly thereafter, petitioner told Livingston he wanted to take a girl who had not

11   previously had professional sex and kill her before anyone else "had" her.  Livingston told

12   petitioner about Brenda Oakden, a 19-year old roommate of a receptionist at Livingston's escort

13   service.  Thus it was that in April 1983, Burns escorted Oakden to petitioner's warehouse,

14   where petitioner killed her.

15          In May 1983, Oakden's nude body was found encased in a barrel that had been dumped

16   in Golden Gate Park.  She had been shot in the back of the head.  Buried with her in the same

17   barrel was the body of another prostitute, Phyllis Melendrez.  She too had been killed

18   execution-style by a gunshot to the back of the head.  The police also found an adjacent barrel

19   containing the body of Michael Thomas, a pimp.  Petitioner's aim in shooting Thomas was

20   slightly off, as the bullets did not penetrate his brain.  This left open the possibility that he died

21   not from the gunshot wounds, but of asphyxiation after being sealed in the barrels.

22          Petitioner confided the commission of the murders of Melendrez and Thomas to

23   Michael Shing, another escort service owner, when he solicited Shing's help in disposing of

24   the bodies.  He described forcing Melendrez and Thomas to kneel before he shot them.

25   He described how much they bled.

26          In addition to his admission, petitioner was linked to the "barrel" murders by extensive

27   evidence.  The barrels in which the bodies were found had been stolen from a storage yard

28   located three structures away from petitioner's warehouse.  Petitioner's fingerprints were found

on the barrels, including in concrete used to seal the barrels.  Angel Burns' palm print was also found on one barrel.  Plastic bags resembling those around Thomas' corpse were recovered from petitioner's van.  The bags displayed a design defect identical to the defect in the bag around the corpse.  Napkins similar in color and red wire were also found in the warehouse as well as on the corpse.  Various handguns and ballistics were also found at the warehouse.  Petitioner's removal of the barrel of one of the guns made it impossible to identify it as a murder weapon.

Later in May 1983, Shing arranged for petitioner to utilize Monica Tafoya's services as an escort.  According to Tafoya, upon her arrival at the warehouse, petitioner handcuffed and gagged her, raped her twice and orally sodomized her several times during an eight-hour ordeal.  Petitioner freebased cocaine during the incident.  At petitioner's insistence, Shing joined in and raped Tafoya at least once, while petitioner watched.  Petitioner eventually instructed Shing to kill Tafoya, but Shing instead drove Tafoya to the San Francisco airport, where she retrieved her car.

In July 1983, petitioner paid for the escort services of Diane Armstrong.  Burns drove Armstrong to petitioner's warehouse, where they agreed upon a price of $400 for an hour of sex.  During their encounter, however, which lasted all night, petitioner strung Armstrong by her wrists from the ceiling against her will, and choked and punched her when she resisted.  Petitioner also freebased cocaine during the incident.  Armstrong survived.

Barbara Searcy went to petitioner's warehouse to collect money he owed her.  The events leading to her death are somewhat ambiguous.  At some point, petitioner killed her.  When Livingston arrived at petitioner's warehouse, he showed her Searcy's body, which was wrapped in plastic sheeting and placed in a green hamper.  He explained that he had killed her for personal reasons.

In August 1983, Kathryn Barrett, a drug dealer, offered to sell petitioner cocaine.  Petitioner's friend, Michael Francis, suggested they steal the cocaine.  At petitioner's request, Livingston drove Barrett to petitioner's warehouse and went to a bar to wait.  Two hours later, petitioner called Livingston and told her she need not pick up Barrett.  When Livingston

returned to the warehouse, she observed Francis stabbing Barrett in the chest. Barrett continued to moan. When Livingston started to leave, petitioner intercepted her and told her that Barrett would not be recognized even if someone found her. Barrett continued to moan. Disgusted with Francis' inability to kill Barrett, petitioner returned to their location in the warehouse. Francis later told Livingston that petitioner hit Barrett in the mouth with a sledgehammer, and that he could hear her bones cracking. Barrett's body was found nude and wrapped in plastic sheeting on a street in South San Francisco.

At the guilt phase of trial, petitioner testified at length and claimed factual innocence. He denied having committed any of the murders. The defense was that each murder was an isolated incident committed by one or more of his acquaintances. Counsel called an expert pharmacologist, Dr. Sidney Cohen, to testify, in effect, that planned aggression while under the influence of cocaine, would have been *un*likely, a circumstance that figures into the analysis below. Extensive circumstantial and physical evidence, however, as well as accomplice testimony, amply supported petitioner's conviction.

Livingston entered a plea agreement with the prosecution and testified at trial. Under the terms of the agreement, she was permitted to plead guilty as an accessory to the Barrett murder, and to admit a 1976 manslaughter conviction.

Following deliberations, the same jury that had convicted petitioner in the guilt phase found the penalty of death to be an appropriate sentence. The jury's 1986 determination was independently reviewed and affirmed by the trial judge.

**PROCEDURAL HISTORY**

The California Supreme Court affirmed petitioner's 1986 conviction and sentence in July 1991. *Sully*, 53 Cal. 3d at 1210. The United States Supreme Court denied his petition for writ of certiorari on March 23, 1992.

Petitioner filed his federal habeas petition on December 16, 1996. His case was stayed pending exhaustion of claims in state court. Petitioner completed his exhaustion proceedings in October 2000. In March 2001, petitioner filed an amended federal habeas petition. Respondent filed an answer in December 2001.

On December 8, 2003, the Court granted respondent's amended motion for summary judgment on claims 12, 13, 19, 20, 21, 22, 26 and 38 as barred by the non-retroactivity principle announced in *Teague v. Lane*, 489 U.S. 288 (1989). On July 7, 2004, the Court granted respondent's motion for summary judgment on claims 15, 16, 25(a), 25(c) and 32 as procedurally defaulted and deferred ruling on whether petitioner has shown cause and prejudice to overcome the default.

Following a case management conference held on September 29, 2004, a schedule was set for cross-motions for summary judgment on record-based claims. The Court scheduled a further case management conference to be held on October 21, 2004. On October 18, 2004, the parties submitted a joint statement proposing that, unless the Court granted summary judgment for petitioner on any of his record-based claims, upon their resolution, respondent would file a motion for summary judgment on all remaining claims. Petitioner would thereafter file a combined opposition and motion for an evidentiary hearing. Respondent would file a reply and opposition to the motion for an evidentiary hearing. Petitioner would subsequently file a reply to respondent's opposition to his motion for an evidentiary hearing.

On October 21, 2004, counsel for petitioner failed to appear at the case management conference and it was continued until October 26. Respondent was given a proposed order directing the parties to bifurcate, in the interest of efficiency, their litigation of summary judgment and evidentiary hearing issues. The Court asked respondent to meet and confer with petitioner's counsel and to send a letter whether the parties would agree. If the parties agreed with the order, they would not need to appear on October 26. On October 22, the parties filed a statement stating their agreement with the litigation schedule set forth in the proposed order. By order dated November 21, 2004, respondent was to file a motion for summary judgment on any remaining claims following the resolution of the cross-motions for summary judgment on record-based claims. The agreed-on order postponed any motions for an evidentiary hearing to follow the resolution of respondent's motion for summary judgment.

1        The cross-motions for summary judgment were decided on June 15, 2006.

2    Respondent's motion for summary judgment was granted on claims 23, 24, 25(b) and 27–31.

3    Petitioner's cross-motion for summary judgment on those claims was denied.

4        On September 21, 2006, respondent filed the instant motion for summary judgment on

5    remaining claims.  On March 2, 2007, petitioner filed a 95-page opposition, which included a

6    discussion of his entitlement to an evidentiary hearing.  Petitioner also filed an application to

7    file an oversize brief.  This was denied.  The denial instructed petitioner to file an opposition

8    not to exceed 60 pages, and to reserve any argument regarding his entitlement to an evidentiary

9    hearing until resolution of the summary judgment motions.  Petitioner filed an opposition on

10    April 6, 2007.  Respondent filed a reply on June 11, 2007.  A hearing was held on April 2,

11    2008.

**STANDARD OF REVIEW**

13    **1.    SUMMARY JUDGMENT.**

14        Summary judgment is proper when "the pleadings, depositions, answers to

15    interrogatories, and admissions on file, together with the affidavits, if any, show that there is

16    no genuine issue as to any material fact and that the moving party is entitled to judgment as a

17    matter of law."  Fed. R. Civ. P. 56(c).  An issue is "genuine" only if there is a sufficient

18    evidentiary basis on which a reasonable fact-finder could find for the nonmoving party, and

19    a dispute is "material" only if it could affect the outcome of the suit under governing law.

20    *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986).  A principal purpose of the

21    summary judgment procedure "is to isolate and dispose of factually unsupported claims."

22    *Celotex v. Catrett*, 477 U.S. 317, 323–24 (1986).  "Where the record taken as a whole could not

23    lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for

24    trial.'"  *Matsushita Elec. Ind. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986).  The motion

25    should not be granted, however, if a reasonable fact-finder, viewing the evidence in the light

26    most favorable to the non-moving party, could resolve a material issue in the non-moving

27    party's favor.  *See Anderson*, 477 U.S. at 248–49.

28

**United States District Court**
For the Northern District of California

7

The moving party always bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. If it meets this burden, the moving party is then entitled to judgment as a matter of law when the non-moving party fails to make a sufficient showing on an essential element of his case with respect to which he bears the burden of proof at trial. *Id*. at 322–23. If the moving party satisfies its initial burden, the non-moving party cannot defeat summary judgment merely by demonstrating "that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586.

The Court must draw all reasonable evidentiary inferences in favor of the non-moving party, including questions of credibility and of the weight to be accorded particular evidence. *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 520 (1991) (citing *Anderson*, 477 U.S. at 255); *Matsushita*, 475 U.S. at 588; *T.W. Elec. Service, Inc. v. Pacific Elec. Contractors*, 809 F.2d 626, 630–31 (9th Cir. 1987). It is the Court's responsibility "to determine whether the 'specific facts' set forth by the nonmoving party, coupled with undisputed background or contextual facts, are such that a rational or reasonable jury might return a verdict in its favor based on that evidence." *T.W. Elec. Service*, 809 F.2d at 631.

## 2. FEDERAL HABEAS REVIEW.

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a district court may not grant a writ of habeas corpus with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. 2254(d). A federal court must presume the correctness of the state court's factual findings. 28 U.S.C. 2254(e)(1).

The "contrary to" and "unreasonable application" clauses of Section 2254(d) have separate and distinct meanings. *See Williams v. Taylor*, 529 U.S. 362, 404 (2000). A state court's decision is "contrary to" clearly established federal law if it fails to apply the correct controlling authority or if it applies the controlling authority to a case involving facts materially

indistinguishable from those in a controlling case, but nonetheless reaches a different result. *Id.* at 413–414. A decision is an "unreasonable application" of federal law if "the state court identifies the correct governing legal principle . . . but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 414.

"[A] federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must be objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 75–76 (2003). "While the 'objectively unreasonable' standard is not self-explanatory, at a minimum it denotes a great[] degree of deference to the state courts . . . ." *Clark v Murphy*, 331 F.3d 1062, 1068 (9th Cir. 2003).

Holdings of the Supreme Court at the time of the state court decision are the only definitive source of clearly established federal law under AEDPA. *See Williams*, 529 U.S. at 412. While circuit law may be "persuasive authority" for purposes of determining whether a state court decision is an unreasonable application of Supreme Court law, only the Supreme Court's holdings are binding on the state courts and only those holdings need be reasonably applied. *See Clark*, 331 F.3d at 1070.

When a state court decision is unaccompanied by a rationale for its conclusions, there is no basis other than the record "for knowing whether the state court correctly identified the governing legal principle or was extending the principle into a new context." *Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000). In such situations, a federal court must conduct an independent review of the record to determine whether the state court decision is objectively unreasonable. *Ibid.* While federal courts "'are not required to defer to a state court's decision when that court gives [them] nothing to defer to, [they] must still focus primarily on Supreme Court cases in deciding whether the state court's resolution of the case constituted an unreasonable application of clearly established federal law.'" *Greene v. Lambert*, 288 F.3d 1081, 1089 (9th Cir. 2002) (quoting *Fisher v. Roe*, 263 F.3d 906, 914 (9th Cir. 2001)).

Even if a petitioner meets the requirements of Section 2254(d), habeas relief is warranted only if the constitutional error at issue had a substantial and injurious effect or

influence in determining the jury's verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993). Under this standard, petitioners "may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'" *Brecht*, 507 U.S. at 637 (citing *United States v. Lane*, 474 U.S. 438, 439 (1986)).

### A.      Claim 3.

Claim 3 alleges ineffective assistance of counsel during the penalty phase. Petitioner asserts that his trial counsel, Douglas Gray (now deceased), failed to investigate and present mitigating evidence of his chronic substance abuse, mental state and domination by people who supplied him with drugs and gained control of his warehouse and belongings. This evidence would have provided mitigating factors pursuant to California Penal Code Sections 190.3(d), (g) and (h), or so it is alleged. Petitioner presented this claim to the Supreme Court of California in his state habeas petition. The state court denied it without a reasoned opinion (Pet.'s Exh. C-6).

In order to prevail on the merits of this claim, petitioner would need to establish that counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). *First*, petitioner must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. The relevant inquiry is not what defense counsel could have done, but rather whether the choices made by defense counsel were reasonable. Habeas review of counsel's performance must be deferential. A strong presumption exists that counsel's conduct falls within the wide range of reasonable professional assistance. *See Strickland*, 466 U.S. at 689; *Sanders v. Ratelle*, 21 F.3d 1446, 1456 (9th Cir. 1994); *Babbitt v. Calderon*, 151 F.3d 1170, 1173 (9th Cir. 1998). *Second*, petitioner must show that there is a reasonable probability that, but for unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Strickland*, 466 U.S. at 694.

Claim 3 is based on petitioner's proffer of numerous items of evidence.  The principal ones are discussed in this order.  The main habeas declaration is by Dr. George Woods, a psychiatrist.  He was not involved at the trial stage.  In a declaration made eleven years after the verdict, Dr. Woods opines that petitioner suffered from longstanding mental impairments, including symptoms of obsessive-compulsive disorder, an affective disorder and schizophreniform spectrum disorders (Pet.'s Exh. 3 at 23).  Dr. Woods states that Sully was consuming massive amounts of cocaine, thereby lost weight, lost sleep, became a paranoid recluse, hallucinated, blacked out, had memory losses, was unable to concentrate and was delusional, all of which affected, the declaration states, the ability to appreciate the criminality of his actions due to cocaine consumption.  These circumstances, he opines, compromised petitioner's ability to inhibit his impulses at the times of the murders (*see* California Penal Code Section 190.3(d)), prevented him from appreciating the criminality of his conduct (*see* Section 190.3(h)), and rendered him subject to the will and domination of others (*see* Section 190.3(g)).

Trial counsel did develop petitioner's cocaine use at trial but presented it in a way to bolster petitioner's testimony to the jury in which he claimed innocence.  Significantly, Dr. Woods recognizes that his own opinions are much at odds with the guilt-phase testimony of an expert UCLA pharmacologist called by trial counsel to support petitioner's testimony.  Dr. Woods concedes that the trial expert was a "relatively well known professor at UCLA."  Nonetheless, Dr. Woods claims the expert trial testimony was in error.  This critique consumes four pages of the Woods declaration, more about which below.

The proffer also calls on Psychiatrist Philip Grossi.  He was retained by trial counsel to ensure that petitioner did not lose his composure before the jury.  Dr. Grossi asserts that he was not asked to evaluate petitioner "against any legal standards including his competence to stand trial, his mental state at the time of the offenses, or the presence of statutory mitigating factors relating to mental state and/or intoxication" (Pet.'s Exh. 9 at 1).  He therefore did not conduct a forensic examination of petitioner.  Rather, he was hired to provide supportive therapy during trial.

The proffer also includes a declaration from Psychologist Mark Elin.  He tested petitioner, not for the purpose of forensic analysis, but to assist Dr. Grossi in providing supportive therapy during trial.  Dr. Elin diagnosed petitioner as having a "narcissistic character disorder with an underlying borderline organization," according to his declaration (Pet.'s Exh. 9 at 18).  The proffer further includes a declaration by Attorney John Balliet.  He was appointed four months before trial as co-counsel.  He states that "many times [he] would not know what was expected of [him] until [they] got into court on any given day" (Pet.'s Exh. 28 at 2). He avers that although he did not participate in the preparation of the penalty phase, he was informed by Attorney Gray when the penalty phase began that he would be responsible for examining the state's witnesses as well as presenting a majority of the defense witnesses.

The proffer further includes the declaration of Attorney Thomas J. Nolan addressing the standard of practice in 1986 for the investigation and presentation of mitigating evidence at a capital trial (Pet.'s Exh. 2).  Attorney Nolan contends that Attorney Gray's performance fell below the standard of practice in California at that time because he allegedly failed to adequately investigate, prepare and present evidence of petitioner's chronic substance abuse, mental impairments and domination by others.  *Id.* at 8.

Finally, petitioner includes medical records from Chope Community Hospital (Pet.'s Exh. 8).  After petitioner was arrested in 1983, he was referred to Chope because he was deemed possibly suicidal.  At the hospital, however, he was administered anti-psychotic medication and released.

*          *          *

To understand why Claim 3 should and must be rejected on summary judgement, it is important to remember that petitioner elected to testify and to pursue a defense of complete factual innocence.  He testified at length and with composure and coherence.  He steadfastly denied guilt.

Although petitioner claimed he was innocent of the murders, he did not deny his drug abuse.  Rather, his approach was that while he may have been a cocaine addict, his drug use could not have fueled a murderous rampage.  To that end, in his opening statement, counsel

12

United States District Court

For the Northern District of California

stated that it is undisputed that petitioner, a former police officer and successful businessman, tragically fell victim to the "American epidemic" of drug use (Tr. 4640). "[W]hat is disputed is who did [the crimes]" (Tr. 4641).

Petitioner also testified regarding the scope and effects of his drug use. In discussing free-basing, petitioner testified that he felt "an immediate accelerated energy, wide awake, absolutely no appetite, an overall well feeling" (Tr. 8082). He stated that the effects of cocaine usually lasted about fifteen or twenty minutes, and that after that, he just knew he wasn't high anymore (Tr. 8083). "It wasn't like you crash down or anything" (Tr. 8083). Petitioner stated that by the end of 1982, he was consuming approximately one-fourth to one-eighth of an ounce of cocaine daily (Tr. 8082). On cross-examination, however, he maintained that he was at all times able to appreciate the criminality of his conduct and denied any emotional disturbance (Tr. 8681–82). In his closing argument, counsel reiterated that while petitioner was guilty of bad judgment, patronizing prostitutes and drug use, he was not guilty of the murders (Tr. 8877).

To strengthen this story, his counsel called Dr. Sidney Cohen, a respected pharmacologist to testify concerning the effects of cocaine on the user. Dr. Cohen testified before the jury that a cocaine user remains aware of his conduct, and does not lose consciousness or experience "blackouts" (Tr. 8612). Significantly, he testified that while cocaine use and aggression may be related, "planned" aggression is difficult under the influence of cocaine (Tr. 8608). This was consistent with petitioner's testimony, who denied any memory impairment due to cocaine consumption and denied any crimes while under the influence (Tr. 8636). It bolstered petitioner's defense of factual innocence, as it attempted to foreclose the possibility that petitioner might have committed the murders while on a drug-fueled rampage, suggesting that his claim of innocence should be trusted. The jury, however, rejected the defense.

*This strategic choice by petitioner — to claim innocence and to bolster it with pharmacologist evidence — necessarily limited his penalty-phase options.* After adopting this line of defense, it would have been most contradictory to reverse field and to present the theory petitioner now claims should have been pursued at the penalty phase. To have done so

United States District Court

For the Northern District of California

1    would have appeared duplicitous in the extreme.  In fact, petitioner's own habeas expert,

2    Attorney Nolan, opines that "the introduction by the defense of Dr. Cohen's testimony at the

3    guilt phase of trial removed Mr. Sully's substance abuse addiction as a possible mitigating

4    factor in this case" — albeit for a different reason:  he claims that it established that petitioner

5    was alert at all times and undercut the defense theory that six homicides occurred at his

6    warehouse without his awareness of these events (Pet.'s Exh. 2 at 11–12).  The pursuit of one

7    defense strategy, at the expense of another, however, is a tactical decision "for which there is

8    no correct answer, but only second guesses."  *See Hendricks v. Calderon*, 70 F.3d 1032, 1041

9    (9th Cir. 1995).

10           This also explains why habeas proffer is forced to contradict the sworn trial testimony of

11   Dr. Sidney Cohen.  It is conceded that Dr. Cohen was qualified and respected.  The thrust of his

12   trial testimony as to the effects of cocaine was intended to aid petitioner's claim of factual

13   innocence, to which petitioner himself testified.  Trial counsel cannot now be faulted for

14   affirmatively relying upon the sworn testimony of an expert conceded by all to have been

15   qualified and respected.  Indeed, as discussed, had trial counsel then adopted the tack now

16   proffered, it would have resulted in an inconsistent trial strategy.  The current tack of

17   Dr. Woods versus the tack of Dr. Cohen at trial are opposites.  Dr. Cohen testified that the

18   relationship between cocaine and aggression is limited to the violence that may occur in

19   connection to the cocaine trade, and the compulsion to obtain funds to purchase cocaine (Tr.

20   8608).  Dr. Woods on the other hand, now states that violent behavior may be prominent during

21   cocaine psychosis (Pet.'s Exh. 3 at 7).  Dr. Cohen testified that cocaine users remain aware of

22   their conduct (Tr. 8612).  Dr. Woods, however, now states that as a result of cocaine use,

23   petitioner was mentally impaired and unable to appreciate the criminality of his conduct (Pet.'s

24   Exh. 3 at 12).  Had the habeas tack been attempted at the penalty phase, the theory would now

25   be made that trial counsel pursued inconsistent theories.  *See Hendricks*, 70 F.3d at 1041.

26   Attorney Gray instead pursued a single coherent theory.  It did not succeed but that is far from

27   being ineffective.

28

United States District Court

For the Northern District of California

1    This order fully assumes, as alleged, that trial counsel had a duty to inquire into any

2    potentially viable mitigation theory based on petitioner's drug abuse and any other

3    mental-health impairments.  Trouble is, once petitioner and trial counsel decided to testify and

4    to claim factual innocence and noninvolvement and to present Dr. Cohen's expert conclusions

5    to the jury, the penalty-phase options were narrowed.  The habeas proffer would have been so

6    inconsistent as to lack viability.  No claim is made herein that counsel was ineffective in

7    allowing petitioner to claim factual innocence.  Thus, the first prong of the *Strickland* test

8    cannot be met, even crediting petitioner's habeas declarations.  *See Pinholster v. Ayers*, Nos.

9    03-99003, 2008 WL 1914699, at *11 (9th Cir. May 2, 2008) (to avoid the trap of 20/20

10   hindsight, deference must be accorded to counsel's judgment given the evidence and the type of

11   defense defendant wanted to pursue).

12   With respect to the second prong, this order finds that even if the habeas proffer had

13   been laid fully before the jury, it would have done more harm than good and there is no

14   reasonable probability that it would have changed the death verdict.  *First*, as stated, the thrust

15   of the habeas proffer would have been inconsistent with the defense's cocaine-effects testimony

16   presented via Dr. Cohen to bolster petitioner's credibility in claiming factual innocence.

17   That inconsistency would have been obvious and risked undermining any chance petitioner

18   otherwise had for leniency (based on the mitigation evidence that was presented).

19   *Second*, the aggravation evidence was virtually insurmountable.  This was not a single

20   murder.  This was a long siege of six horrific murders.  Execution-style was the way

21   petitioner murdered three of his victims:  Brenda Oakden, Michael Thomas and Phyllis

22   Melendrez.  Their bodies were later found in barrels sealed with concrete in Golden Gate Park.

23   Gloria Fravel endured prolonged torture before her body was finally dumped on Skyline

24   Boulevard.  Brenda Searcy was executed with a gunshot to the back of the head.  In disposing

25   of her body, petitioner and Livingston tied it to the back of his truck and intended to drag it until

26   it was beyond recognition, but were interrupted and did not complete the task.  Kathryn Barrett

27   was tortured and then killed.  When Michael Francis experienced difficulty killing her,

28

15

United States District Court

For the Northern District of California

petitioner intervened, delivering a bone-crushing blow to her mouth with a sledgehammer. Petitioner kept news clippings of his work and bragged about it.

Furthermore, the jury heard testimony regarding other violent acts committed by petitioner.  They heard evidence of petitioner's rape and forcible oral copulation of Monica Tafoya, imprisonment and assault of Diane Armstrong and battery of Louisa Garcia, as well as threats to kill his ex-wife Donna Skalisky in a series of harassing phone calls.

The jury also heard testimony from Skalisky, her friend, Jean Marsala, and her co-worker, Marie Williams.  All three witnesses testified about petitioner's killing of Skalisky's daughter's ducks after she and petitioner decided to divorce.  Skalisky's daughter and her grandmother discovered the ducklings in the backyard.  The ducklings' heads had been ripped off.

The United States Supreme Court and other courts have repeatedly found that the egregious nature of a defendant's offenses may overcome any alleged prejudice resulting from counsel's failure to introduce mitigating evidence.  *See, e.g.*, *Strickland*, 466 U.S. at 700 ("given the overwhelming aggravating factors, there is no reasonable probability that the omitted evidence would have changed the conclusion that the aggravating circumstances outweighed the mitigating circumstances"), *Allen*, 395 F.3d at 1009 (finding no prejudice, despite deficient performance, because of overwhelming evidence in aggravation, consisting, in part of Allen's history of orchestrating and committing violent robberies and plotting the murder of several individuals who testified against him), *Bonin v. Calderon*, 59 F.3d 815, 837 (9th Cir. 1995) (aggravating circumstances were so numerous and so compelling that it is improbable that juries would have returned a sentence of life imprisonment rather than death, even if all of the mitigating evidence offered at the evidentiary hearing had been presented at trials), *Gerlaugh v. Stewart*, 129 F.3d 1027, 1033, 1042 (9th Cir. 1997) (no prejudice resulted from counsel's failure to present three character witnesses, as the circumstances of the crime were overwhelming).

*Third*, the mitigating value of evidence of chronic substance abuse is always questionable.  *See Mayfield*, 270 F.3d at 931 n.17 (9th Cir. 2001) (juries are unlikely to favor

United States District Court

For the Northern District of California

1    defenses based on abuse of dangerous drugs in evaluating a defendant's culpability).  It is very

2    doubtful that any juror would have found that petitioner's voluntary intoxication rendered him

3    any less culpable.[1]

4              *Fourth*, petitioner's mental state evidence is equivocal.  Dr. Elin's report, based on his

5    evaluation of petitioner in 1985, stated that he did not uncover evidence of impaired intellectual

6    functioning (Pet.'s Exh. 10 at 16).  The purpose of Dr. Elin's testing was to "assess his present

7    level of psychological functioning and to determine, if any the effects of cognitive and/or

8    psychopathological functioning impacting on his life" (*id*. at 1).  He stated that petitioner did

9    "not evidence any deterioration in cognitive and/or perceptual functioning that would interfere

10   with his day to day activities . . . " (*id*. at 16).  Additionally, the Chope Hospital records

11   indicated that although petitioner had expressed an intent to kill himself in jail, upon discharge,

12   his mood was calm and cheerful (Pet.'s Exh. 8).  They also indicate that he had no past

13   psychiatric history (*ibid*).  Overall, it is doubtful that the opinion of a psychiatric expert such

14   as Dr. Woods would have altered the outcome of the penalty phase. *See Pinholster*, 2008 WL

15   1914699, at *22 (California Supreme Court, which acknowledged that petitioner gloried in his

16   criminal history, reasonably could have concluded that no amount of clever "after-the-fact"

17   assessment by habeas defense psychiatrists would have convinced even a single juror to change

18   his vote).

19             *Fifth*, petitioner's allegation that he was dominated by other people is mere *ipse dixit*.

20   Petitioner cites a declaration by Angel Burns (Pet.'s Exh. 4), Dr. Woods' declaration (Pet.'s

21   Exh. 3), and his mother's declaration (Pet.'s Exh. 14), in support of this contention.  Burns' and

22   his mother's declarations, however, merely state that as a result of his drug consumption, he

23   deteriorated physically and did whatever Tina Livingston asked (Pet.'s Exh. 4 at 1), and that

24   "strange people" started "hanging around his business" (Pet.'s Exh. 14 at 3).  Dr. Woods'

25

26         [1]  It is worth pointing out that while our circuit has recognized the value of "mental problems" as
     mitigation evidence, it has usually done so outside the context of cocaine abuse.  Neither *Hendricks*, nor *Allen*,
27   nor *Lambright v. Schriro*, 490 F.3d 1103 (9th Circ. 2007), demonstrate the strength of cocaine abuse as a
     mitigating factor.  Nonetheless, this order presumes that voluntary cocaine abuse can and should be presented as
28   a mitigation factor in an appropriate case.  That said, there is no reasonable probability of a different outcome
     given the circumstances stated above.

1    declaration makes the conclusory statement that as a result of his cocaine addiction and mental

2    impairment, petitioner's will was subjugated to the will of a small circle of unidentified

3    "transient criminals" (Pet.'s Exh. 3 at 22–23).  The record however, is replete with evidence

4    of petitioner controlling everything and everyone who entered and left the warehouse.

5    He controlled his victims, the manner of their death, and the disposal of their bodies.

6    Petitioner testified that he "had control of [his] environment" and "knew basically what

7    was going on in the warehouse" (Tr. 8362).

8            *Sixth*, claim 3 is anchored in very little Supreme Court law.  While circuit law provides

9    persuasive authority for purposes of determining whether a state court decision is reasonable

10   under the AEDPA, only the Supreme Court's holdings are binding and those extant in the

11   1985–86 time frame are the ones that count.  *See Clark*, 331 F.3d at 1070.

12           In reviewing the record, this order concludes that given the overwhelming evidence

13   introduced in aggravation, counsel's pursuit of a strategy other than the proffer now favored by

14   petitioner was reasonable and given the reasonable strategy actually followed in the guilt phase,

15   the failure to reverse field with an inconsistent story at the penalty phase did not result in

16   cognizable prejudice.

17           The decisions cited by petitioner are distinguishable.  In *Douglas v. Woodford*, 316 F.3d

18   1079, 1091 (9th Cir. 2003), for example, the mitigating evidence that the jury failed to consider

19   as a result of counsel's deficient performance might well have influenced the jury's appraisal of

20   the defendants' moral culpability.  The jury did not hear evidence of Douglas' abandonment as

21   a child and his being raised by an abusive, alcoholic foster father who locked him in a closet,

22   nor the fact that he ran away at fifteen to join the Marines, that he was arrested, then beaten and

23   gang-raped in jail, that in the Marines, he helped rescue two drowning sailors, that he suffered

24   damage to his temporal lobe in a car accident, and that while working in furnishing refinishing,

25   he was exposed to toxic solvents daily.  *Id*. at 1088.  Similarly in *Frierson v. Woodford*,

26   463 F.3d 982, 993–94 (9th Cir. 2006), the jury was never presented with evidence that Frierson

27   suffered multiple, severe brain injuries as a child that may have resulted in organic brain

28   dysfunction, that he suffered from a learning disability, low intelligence and may have been

borderline retarded, that he suffered from an emotional disorder and was a chronic lifelong substance abuser.  In comparison, the evidence that was omitted from petitioner's trial was weak.

*Correll v. Ryan*, No. 03-99006, 2008 WL 2039074 (9th Cir. May 14, 2008), is similarly distinguishable.  In *Correll*, the Ninth Circuit reversed the district court's denial of Correll's petition for writ of habeas corpus, finding that he received ineffective assistance of counsel at sentencing.  Correll had been convicted in Arizona in 1984 of first degree murder, attempted first degree murder, kidnaping, armed robbery, and first degree burglary, all for his role in a triple homicide.  The court found that counsel failed to adequately investigate and present evidence of Correll's mental health disorders, psychiatric commitments, drug abuse history, brain injury and family dysfunction, and concluded that Correll was prejudiced by counsel's performance.  *Id*. at *17, 26.  Correll's counsel however, presented *no* mitigating evidence, relying instead on the submission of a presentence report which contained some mitigating arguments.  *Id*. at *17.  The failure to present a mitigation case was particularly indefensible in light of Arizona law, which at that time, required the imposition of the death penalty absent a case in mitigation.  *Id*. at *26.  This case was unusual in the capital context in that Correll did not kill any of the victims.  The actual murders were committed by another person.  *Ibid*.

Unlike Correll's counsel, petitioner's counsel did in fact present extensive evidence in mitigation, just not the evidence cited by petitioner in his habeas proffer.  The particularity of Arizona law which made counsel's performance particularly prejudicial in Correl's case is not an issue in petitioner's case.  Furthermore, in contrast with Correll, petitioner himself brutally murdered his six victims.

And, as stated, petitioner and his counsel pursued a strategy of exercising petitioner's right to testify in his own defense and bolstering it with expert testimony at the guilt phase.  This election narrowed petitioner's options at the penalty phase.  This factor was not present in *Correll*.  This factor *was* present in *Pinholster*, where the petitioner had testified, denying his murders, and where the Ninth Circuit held that the defense denial strategy would "obviously affect the jury's view of Pinholster's mental impairment defense."  2008 WL 1914699, at *22.

**United States District Court**
For the Northern District of California

1    *Earp v. Ornoski*, 431 F.3d 1158 (9th Cir.2005), is also inapposite.  In *Earp*, the

2    Ninth Circuit vacated a district court's grant of summary judgment on an ineffective assistance

3    of counsel claim and found that Earp was entitled to an evidentiary hearing because he had

4    demonstrated a colorable claim that counsel's mitigation evidence was deficient, and that he

5    suffered prejudice thereby.  *Id*. at 1180.  Earp had been convicted of the rape and murder of an

6    eighteen-month-old, but claimed that during the penalty phase of trial, the testimony presented

7    did not fully encompass the violence, abuse and alcoholism he suffered during his formative

8    years.  The Ninth Circuit found that to establish entitlement to an evidentiary hearing on an

9    ineffective-assistance claim, Earp was not required to conclusively demonstrate that counsel

10   was prejudicially deficient, but merely had to establish a colorable claim that, if proven, would

11   show that counsel's failure to investigate mitigating evidence constituted ineffective assistance.

12   *Id*. at 1173.  Here, even assuming arguendo that counsel was somehow deficient and fully

13   crediting the proffer and its consequences as far as they can reasonably reach, they would not

14   have painted a materially different picture of petitioner's background and culpability.

15        Based on an independent review of the record, the Court concludes that the state court

16   decision with respect to claim 3 was not objectively unreasonable.  Accordingly, summary

17   judgment on claim 3 is **GRANTED** in favor of respondent.

18                       **B.    Claim 4.**

19        Claim 4 alleges that Attorney Gray was ineffective during the guilt phase for failing to

20   investigate and present a mental-state defense to the charged crimes and/or special

21   circumstances.  Had counsel conducted an adequate investigation, it is said now, he would

22   have uncovered a history of mental impairments and drug use, and concluded that petitioner

23   did not have the mental state necessary to have committed the charged crimes, or for the

24   special circumstance to be found true.  Petitioner raised this claim in his state habeas petition.

25   The Supreme Court of California denied it without a reasoned opinion (Pet.'s Exh. C-6).

26        Respondent moves for summary judgment on this claim on the grounds that counsel

27   adequately investigated petitioner's mental state and substance abuse, and made a reasonable

28   strategic choice to avoid justifying petitioner's barbaric behavior.  He alleges that further

investigation was rendered unnecessary by virtue of petitioner's decision to testify at trial and allege that he was not present during any of the murders.  Respondent contends that this testimony would have contradicted the assertion of any diminished-capacity or other mental-state defense.

Respondent is correct.  The Supreme Court has stated:

> [C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.  In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgment.

> The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions.  Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant.  In particular, what investigations are reasonable depends critically on such information.  For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether.  And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable.

*Strickland*, 466 U.S. at 691.  Here, counsel's decision not to pursue a mental-state defense during the guilt phase was a reasonable, tactical decision.  As stated earlier, petitioner testified at trial in a coherent manner, denied all guilt and placed the blame on his companions (Tr. 8072, 8636).  A mental-state defense would have conflicted with petitioner's trial testimony.  Petitioner's choice to testify as he did obviated the need for an investigation of a mental-state defense.  *See Turk v. White*, 116 F.3d 1264, 1266–67 (9th Cir. 1997) (defense counsel's reasonable selection of a self-defense theory eliminated counsel's need to investigate a conflicting defense of incompetency); *Correll v. Stewart*, 137 F.3d 1404, 411(9th Cir. 1988) (counsel was not ineffective for failing to present psychiatric evidence that would have contradicted the primary defense theory of misidentification).

United States District Court

For the Northern District of California

21

1    No claim is presented that counsel should not have let petitioner testify.  Given that

2    petitioner did testify and claim factual innocence, it would have been folly to have undercut

3    petitioner's story with the line of defense suggested now.

4    An independent review of the record reveals that the state court decision with respect to

5    claim 4 was not objectively unreasonable.  Accordingly, summary judgment on claim 4 is

6    **GRANTED** in favor of respondent.

**C.      Claim 5.**

8    Petitioner alleges that Attorney Gray was ineffective for failing to investigate and present

9    evidence of his incompetence to stand trial and for failing to request that the trial court institute

10   competency proceedings.  This claim is mainly based on the declaration of Dr. Woods.

11   Also cited is other documentary support, including the declaration of Attorney Nolan addressing

12   the standard of practice in 1986 for the preparation of a motion challenging a defendant's

13   competency to stand trial, the declaration of Dr. Grossi, Dr. Elin's report, petitioner's letters to

14   trial counsel, and records from petitioner's 1983 psychiatric referral to the Chope Community

15   Hospital.  Petitioner further argues that had the issue of competency been raised, he would have

16   been found incompetent and would have escaped trial and conviction.

17   In a subclaim, petitioner also alleges that counsel's participation in petitioner's plan to

18   vent his feelings if the jury found him guilty constituted ineffective assistance.  When the guilt

19   verdict was read, petitioner exploded in an angry outburst and was led out of the courtroom.

20   According to Attorney Balliet, Attorney Gray had informed the judge and discussed with the

21   deputies petitioner's intentions (Pet.'s Exh. 28 at 3).  Petitioner raised an equivalent of claim 5 in

22   his state habeas petition.  The state court denied it without a reasoned opinion (Pet.'s Exh. C-6).

23   Respondent moves for summary judgment on claim 5 on the grounds that there was no

24   evidence or event at trial that indicated that petitioner was incompetent, asserting that petitioner

25   relies on a diagnosis by Dr. Woods many years later.  Petitioner was in fact competent, it is said.

26   Neither petitioner's meeting with a psychiatrist prior to trial, nor his testing at the hands of a

27   psychologist, revealed evidence of incompetence.  Respondent claims that petitioner's lengthy

28   and coherent trial testimony, claiming factual innocence, also negates his claim of incompetence.

United States District Court

For the Northern District of California

22

United States District Court

For the Northern District of California

1    In its analysis of claim 11 below, this order finds that petitioner's argument that he was

2    incompetent to stand trial lacks merit.  It follows that counsel was not ineffective for failing to

3    investigate and present evidence of petitioner's incompetence, or for failing to request that the

4    court institute competency proceedings.

5    With respect to petitioner's subclaim regarding Attorney Gray's alleged collusion with

6    petitioner to "facilitate" his outburst, petitioner's allegation is wholly conclusory.

7    Attorney Balliet's declaration merely demonstrates that Attorney Gray was apprehensive about

8    petitioner's possible tirade, and that he informed the judge and deputies of the risk ahead of time,

9    a prudent precaution, for which counsel should be commended, not criticized  (Pet.'s Exh. 28

10   at 3).  There is no evidence that Attorney Gray promoted or encouraged petitioner's outburst.

11   To the contrary, Attorney Gray was the one who had gone to the trouble to retain a therapist to

12   help petitioner maintain his composure.  Petitioner's allegations lack merit.

13   For the above-mentioned reasons, the state court decision with respect to claim 5 was not

14   objectively unreasonable.  Summary judgment on this claim is **GRANTED** in favor of respondent.

15        **D.    Claim 6.**

16   Claim 6 alleges ineffective assistance when his trial attorney failed to object to

17   petitioner's absence from the penalty phase of trial, and further failed to request instructions

18   directing the jury to disregard his absence when rendering its verdict.  Petitioner raised this

19   claim in his state habeas petition.  The state court denied it without a reasoned opinion

20   (Pet.'s Exh. C-6).

21   Respondent moves for summary judgment on this claim on the grounds that counsel was

22   under no obligation to refrain from cooperating with the court in an effort to continue the penalty

23   phase after petitioner disrupted proceedings and voluntarily excused himself from the courtroom.

24   Respondent further asserts that counsel was not required to seek the type of instructions cited by

25   petitioner.

26   Respondent is correct.  When the guilty verdict was read, petitioner exploded in an angry,

27   obscenity-laden outburst and walked out of the courtroom (Tr. 9041–42).  His counsel stipulated

28   that the departure was voluntary (Tr. 9042).  When the penalty phase began, petitioner's counsel

advised the court that petitioner would "continue to disrupt the proceedings and desires to absent himself from the remainder of these proceedings" (Tr. 9051).  *Petitioner affirmed this matter on the record* (Tr. 9051).  The remainder of the proceedings took place in petitioner's absence. The court repeatedly advised the jury of petitioner's desire to absent himself from the proceedings (Tr. 9059, 9089).  The court also reaffirmed petitioner's desire with counsel (Tr. 9836).

Petitioner fails to identify any authority requiring counsel to object to petitioner's absence from the courtroom in light of petitioner's voluntary waiver of his right to be present. As respondent points out, a disruptive defendant waives his right to be present at trial.  *Illinois v. Allen*, 397 U.S. 337, 342–43 (1970).  Petitioner asserts that petitioner's waiver was not knowing and voluntary, but fails to offer any evidence in support of this contention.  The record does not support petitioner's argument.

Nor does petitioner cite any authority requiring counsel to request instructions directing the jury to disregard petitioner's absence when rendering its verdict.  At all events, petitioner was not prejudiced by the lack thereof.  The jury was effectively instructed on the factors to consider and was told that petitioner wished to be elsewhere, from which it was plain that petitioner had the right to do so.  No argument was made by the prosecutor based on his absence.

An independent review of the record reveals that the state court decision with respect to claim 6 was not objectively unreasonable.  Accordingly, summary judgment on claim 6 is **GRANTED** in favor of respondent.

### E.     Claim 7.

Claim 7 alleges ineffective assistance of counsel as a result of a supposed conflict of interest stemming from Attorney Gray's past representation of actual and potential witnesses for the prosecution.  He asserts that Attorney Gray represented several San Francisco police officers in a class action lawsuit challenging an allegedly discriminatory sergeant's exam.  He states that Attorney Gray had also represented prosecution witnesses Marcos Capri-Dowdy and Kenneth Moses in the past.  Capri-Dowdy was the San Mateo County Sheriff's Deputy who secured the scene where Barbara Searcy's body was discovered.  Moses was a San Francisco police

inspector and served as the prosecution's fingerprint expert in relation to fingerprints identified as petitioner's on the tape and concrete used to seal one of the barrels in which the bodies of three of the victims were found.  Petitioner raised this claim in his state habeas petition.  The state court denied it without a reasoned opinion (Pet.'s Exh. C-6).  Petitioner concedes that there are no factual disputes in relation to this claim and requests that the Court adjudicate it on the merits.

Respondent moves for summary judgment on this claim on the grounds that petitioner fails to show an actual conflict that adversely affected trial counsel's performance at trial.  Respondent further asserts that the state court's denial of this claim did not constitute an unreasonable application of United States Supreme Court law.

The Sixth Amendment right to counsel encompasses not only the right to competent counsel but also the right to counsel's undivided loyalty.  *See Mannhalt v. Reed*, 847 F.2d 576, 579 (9th Cir. 1988) (citing *Wood v. Georgia*, 450 U.S. 261, 272 (1981)).  In order to establish a violation of the Sixth Amendment based on a conflict of interest, a habeas petitioner must show that an actual conflict of interest adversely affected his lawyer's performance.  *Cuyler v. Sullivan*, 446 U.S. 335, 348, 350 (1980).  An "actual conflict of interest" only occurs when counsel "actively represented conflicting interests."  *Strickland*, 466 U.S. at 692.  A theoretical or potential conflict is insufficient to constitute actual conflict; instead counsel must have actively represented conflicting interests.  *Bragg v. Galaza*, 242 F.3d 1082, 1087 (9th Cir.), *amended*, 253 F.3d 1150 (9th Cir. 2001); *Morris v. California*, 966 F.2d 448, 455 (9th Cir. 1991).  A petitioner must prove an actual conflict through a factual showing in the record.  *Bragg*, 242 F.3d at 1087; *Morris*, 966 F.2d at 455.

Petitioner fails to demonstrate that an actual conflict adversely affected his counsel's performance.  Attorney Gray's representation of both Capri-Dowdy and Moses predated petitioner's trial.  Petitioner fails to point to anything in the record that suggests that an actual conflict or an impairment of his interests resulted from this prior representation.  He likewise fails to demonstrate how Attorney Gray's representation of several unnamed San Francisco police officers in a class-action lawsuit caused any actual conflict in petitioner's San Mateo trial.

United States District Court
For the Northern District of California

An independent review of the record reveals that the state court decision with respect to claim 7 was not objectively unreasonable.  Accordingly, summary judgment on claim 7 is **GRANTED** in favor of respondent.

### F.      Claim 8.

Petitioner alleges that his rights to the effective assistance of counsel and to a trial free from false evidence were violated by counsel's failure to investigate and present several items of exculpatory evidence during the guilt phase of trial.  Claim 8 consists of six subclaims. Petitioner presented this claim to the Supreme Court of California in his state habeas petition. The state court denied it without a reasoned opinion (Pet.'s Exh. C-6).

Respondent moves for summary judgment on the grounds that the California Supreme Court reasonably denied this claim.  Petitioner does not address respondent's arguments in his opposition.  He concedes that there are no factual disputes in relation to this claim and it can now be resolved on its merits, but states that additional facts relevant to this claim might be developed in the course of discovery proceedings or an evidentiary hearing on other claims. He therefore requests that the Court defer ruling on claim 8 until all other claims are resolved.

Since this order concludes the adjudication of all remaining claims, petitioner's request for deferral is denied.[2]  Each subclaim shall be addressed in turn.

### *(1)      Subclaim A.*

Petitioner contends that counsel should have followed up on information that a person named Gregory Jones took part in the "barrel" murders of Michael Thomas, Phyllis Melendrez and Brenda Oakden.  He argues that an informant named Charles Laughlin told FBI Agent Hanford that Jones had told him that he and two others killed a drug dealer and two women in retaliation for a bad drug deal, and placed their bodies in barrels in Golden Gate Park.

Respondent argues that counsel reasonably decided to focus his energies elsewhere. He asserts that at a hearing, co-counsel Balliet stated that the defense was more interested in speaking to Laughlin than Jones because Jones would most likely deny any involvement

---

[2] Petitioner makes the same request for deferral with respect to claims 9(D), 17, 18, and 33–35.  For the reasons stated above, this request is denied.

(Pet.'s Exh. 30 at 707). Respondent states that neither the prosecution nor the defense knew of Laughlin's whereabouts, and that Hanford was not in California, and was thus outside of the court's subpoena power. He asserts that Laughlin's description of the crimes was inaccurate with respect to the type of ammunition used, the sequence of the bodies in the barrels and his physical ability to have observed certain things from his vantage point. In fact, most of the information conveyed by Laughlin was contained in newspapers.

Respondent is correct. Given the extensive evidence connecting petitioner to the barrel murders, including his fingerprints, footprints, a uniquely flawed bag enshrouding Thomas' corpse, as well as the fact that petitioner had admitted committing the barrel murders to his girlfriend and others, counsel's decision to focus his energies elsewhere was reasonable. *See Yardborogh v. Gentry*, 540 U.S. 1, 5 (2003) ("When counsel focuses on some issues to the exclusion of others, there is a strong presumption that he did so for tactical reasons rather than through sheer neglect"); *Strickland*, 466 U.S. at 690-91 (counsel had a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary).

Petitioner fails to address respondent's arguments, or otherwise demonstrate that the California Supreme Court's decision was unreasonable. Summary judgment on this subclaim is **GRANTED** in favor of respondent.

### (2)    Subclaim B.

Petitioner next faults counsel for failing to follow up on information that an unidentified informant told FBI Agent Kutchinski and San Francisco police officer Phelan that a female prostitute named "Cookie" said that she knew who killed Michael Thomas and Phyllis Melendrez. Cookie had worked for Thomas and was friends with Melendrez. Although neither the prosecution nor the defense ever learned Cookie's real name, they knew allegedly that she was in the intensive care unit at San Francisco County General Hospital.

Respondent moves for summary judgment on this claim on the grounds that petitioner fails to demonstrate prejudice. He claims that the California Supreme Court reasonably rejected this claim. Petitioner fails to address respondent's arguments.

United States District Court

For the Northern District of California

1      Respondent is correct.  The record does not suggest that Cookie would have identified

2  anyone other than petitioner as the killer, that she would have agreed to speak to defense

3  counsel, or that she would have been in a physical condition that permitted her to be interviewed.

4  The fact that she knew Thomas and Melendrez does not lend itself to the suggestion that her

5  testimony would have been exculpatory.

6      Moreover, as discussed above, counsel were aware of a large amount of evidence linking

7  petitioner to the barrel murders.  Given this evidence, counsel's decision to not pursue hearsay

8  that may not even prove exculpatory for petitioner was reasonable.  *See Yardborogh*, 540 U.S.

9  at 5; *Strickland*, 466 U.S. at 690–91.

10      The California Supreme Court's decision with respect to this subclaim was not

11  objectively unreasonable.  Summary judgment on subclaim B is **GRANTED** in favor of

12  respondent.

13              *(3)     Subclaim C.*

14      Petitioner alleges that Attorney Gray was ineffective for failing to pursue information

15  provided in Inspector Ron Schneider's handwritten note that a drug dealer named Sam "Spade"

16  Washington had at some point threatened to kill Michael Thomas.  He asserts that counsel did

17  nothing to investigate Washington's arrest, interview Schneider or attempt to locate and

18  interview Washington.

19      Respondent moves for summary judgment on this claim on the grounds that petitioner

20  fails to demonstrate prejudice.  He claims that the California Supreme Court reasonably rejected

21  this claim.  Petitioner fails to address respondent's arguments.

22      Respondent is correct.  As in the previous subclaim, petitioner fails to establish prejudice.

23  There is nothing to suggest that the alleged threat occurred or was credible, that Washington had

24  the ability to carry it out or that he actually followed up on it.  Again, given the large quantity of

25  inculpatory evidence linking petitioner to the barrel murders, counsel's decision not to pursue

26  this tenuous lead was reasonable.  *See Yardborogh*, 540 U.S. at 5; *Strickland*, 466 U.S.

27  at 690–91.

28

United States District Court

For the Northern District of California

1    The California Supreme Court's decision with respect to this subclaim was not

2    objectively unreasonable.  Summary judgment on subclaim C is **GRANTED** in favor of

3    respondent.

4                    *(4)      Subclaim D.*

5        Petitioner alleges that Attorney Gray was ineffective for failing to investigate

6    impeachment evidence relating to non-witness Angel Burns.  Prosecution witness Tina

7    Livingston introduced Burns' hearsay statements in her testimony.  Petitioner alleges that

8    an investigation would have revealed Burns' criminal past and a motive to lie since she was

9    implicated in the murders of Thomas, Melendrez and Oakden and eventually pled guilty to

10   Oakden's murder.  Petitioner further asserts that despite a conflict of interest, counsel made

11   arrangements with Burns' defense team to share investigation of Livingston's background as

12   well as the allegation that two of the homicides occurred at the Z Hotel, and not at petitioner's

13   warehouse.

14       Respondent moves for summary judgment on this subclaim on the grounds that collateral

15   impeachment of Burns, a non-testifying witness who was inextricably linked to petitioner, was

16   not necessary and that such impeachment would not have helped petitioner's case.  He asserts

17   that the state court reasonably denied this subclaim.  Petitioner fails to address respondent's

18   arguments.

19       Respondent is correct.  Burns was not a prosecution witness, and given that she was also

20   charged with the murders of Thomas, Melendrez and Oakden, she was unlikely to cooperate

21   with the prosecution at the time of petitioner's trial.  Although she ultimately pled guilty to the

22   Oakden murder (Pet.'s Exh. 39), her plea did not occur until after the jury in petitioner's case

23   had sentenced him to death (*ibid.* at 7–8).

24       Furthermore, had petitioner presented evidence of Burns' prior criminal history and of

25   her links to the Z Hotel, there is no reasonable probability that the outcome of his trial would

26   have been different.  Nothing in the record supports his allegations that the murders might have

27   occurred at the Z Hotel.  In fact, petitioner's investigator looked into this possibility (Pet.'s Exh.

28   31 at 2).  The jury further knew that petitioner's fingerprints were found both inside and

1   outside the barrels in which the bodies of Thomas, Melendrez and Oakden were found, and

2   that a barrel-less gun, like the one owned by petitioner, was used to kill all three victims.

3   Further impeachment of Burns would not have helped petitioner's case.

4          An independent review of the record reveals that the state court denial of this subclaim

5   was not objectively unreasonable.  Summary judgment on subclaim D is **GRANTED** in favor of

6   respondent.

7                              *(5)      Subclaim E.*

8          Petitioner alleges that Attorney Gray was ineffective for failing to investigate

9   impeachment evidence relating to non-witness Michael Francis.  Prosecution witness Tina

10  Livingston introduced Francis' prejudicial hearsay statements in her testimony.  Petitioner

11  alleges that an investigation would have revealed that Francis had a motive to lie as he himself

12  was implicated in the murder of Kathryn Barrett.  He claims that the jury was not sufficiently

13  informed about Francis' involvement in the Barrett murder.  He further asserts that the defense

14  was provided with police reports of conversations with two witnesses who described Francis'

15  account of the Barrett homicide without mention of petitioner's involvement (Pet.'s Exhs. 41,

16  42).

17         Respondent moves for summary judgment on subclaim E on the grounds that collateral

18  impeachment of Francis, a non-testifying witness, would not have helped petitioner's case.

19  He asserts that the state court reasonably denied this subclaim.  Petitioner fails to address

20  respondent's arguments.

21         Respondent is correct.  The jury heard substantial testimony of Francis' involvement

22  in the Kathryn Barrett murder.  The jury knew that Francis stabbed Barrett numerous times.

23  The only question was whether petitioner was also involved, a fact that was established through

24  petitioner's statements to the police and his offers to pay Francis to "take the fall" for the Searcy

25  and Barrett murders.  Contrary to petitioner's assertions, the jury was sufficiently informed about

26  Francis' involvement in the Barrett murder.

27         Furthermore, although the police reports of conversations with two witnesses who

28  described Francis' account of the Barrett murder (Pet.'s Exhs. 41, 42) were exculpatory on the

United States District Court
For the Northern District of California

30

surface at least with respect to the Barrett murder, both witnesses, if called to the stand, would have provided testimony that either inculpated petitioner in other crimes or at least corroborated significant parts of the prosecution's case.  In fact, one of the witnesses, Connie Poole (Livingston's daughter), discussed with the police petitioner's offer to pay Francis $10,000 to "take the fall" for the Searcy and Barrett murders (Pet.'s Exh. 41).

An independent review of the record reveals that the state court denial of this subclaim was not objectively unreasonable.  Summary judgment on subclaim E is **GRANTED** in favor of respondent.

### *(6)      Subclaim F.*

Petitioner alleges that Attorney Gray was ineffective for failing to conduct an adequate investigation for purposes of impeaching the prosecution's main witness, Tina Livingston. He asserts that Livingston was the only witness who allegedly was present at petitioner's warehouse during the commission of two of the homicides, and her testimony was therefore crucial.  He argues that (1) additional witnesses should have been brought forth to corroborate Livingston's assault of Tina Urias in 1980 in Arizona — in relation to which Livingston lied that she had used a toy gun as opposed to a real one, (2) evidence should have been produced that Livingston made a false accusation that her daughter had been molested in Arizona, and (3) counsel should not have offered into evidence Livingston's eight handwritten pages to rebut her claim that she did not review transcripts and statements prior to trial because she did not know how to read or write.  The pages contained prejudicial information which corroborated her testimony regarding the homicides.

Respondent moves for summary judgment on this subclaim on the grounds that additional evidence or further impeachment of Livingston would have been of no value to petitioner.  He asserts that the state court reasonably denied this subclaim.  Petitioner fails to address respondent's arguments.

Respondent is correct.  Livingston was fully impeached with regard to the Urias assault (Tr. 7885-90).  The other matters raised by petitioner are not of sufficient import to have prejudiced petitioner.

31

An independent review of the record reveals that the state court denial of this subclaim was not objectively unreasonable. Summary judgment on subclaim F is **GRANTED** in favor of respondent.

### G.    Claim 9.

Claim 9 alleges that ineffective assistance of counsel due to numerous supposed errors committed by trial counsel during the guilt- and penalty-phases of trial. Petitioner raised this claim in his state habeas petition. The state court denied it without a reasoned opinion (Pet.'s Exh. C-6). Claim 9 consists of thirteen subclaims. Each shall be addressed in turn.

#### *(1)    Subclaim A.*

Subclaim A alleges that Attorney Gray was ineffective for failing to obtain the assistance of a mental-health expert to aid in the preparation and presentation of a mental-state defense during the guilt phase, to evaluate his competency to stand trial, and to determine the applicability of statutory mitigating factors during the penalty phase. He asserts that despite the fact that he suffers from mental and emotional impairments, he was never evaluated by a mental-health professional for forensic purposes. Petitioner states that Dr. Grossi and Dr. Elin merely provided supportive therapy during trial to ensure that he does not lose his composure before the jury. Respondent moves to dismiss this claim on the same grounds already addressed.

This subclaim reiterates a generalized version of the allegations contained in claims 3, 4, 5 and 11. For the reasons outlined in the analysis of claims 3, 4, 5 and 11, summary judgment on this subclaim is **GRANTED** in favor of respondent.

#### *(2)    Subclaim B.*

This subclaim alleges that Attorney Gray was ineffective for failing to institute competency proceedings after petitioner erupted in a verbal outburst when the guilt verdict was read and subsequently insisted on absenting himself from the penalty phase. This subclaim reiterates arguments contained in claim 5. For the reasons articulated in the analysis of claim 5 *supra*, summary judgment on this subclaim is **GRANTED** in favor of respondent.

*(3)      Subclaim C.*

This subclaim alleges that he was denied his right to the effective assistance of counsel and a fair determination of penalty when his trial counsel called Deputy District Attorney Stephen Wagstaffe to the stand as a penalty-phase defense witness.  Wagstaffe prosecuted Angel Burns, petitioner's alleged co-participant, and charged her with three counts of murder and three counts of serving as an accessory to murder.  Petitioner alleges that when trial counsel asked Wagstaffe why he chose not to charge Burns with the death penalty, he allowed Wagstaffe to explain why petitioner's case was death-worthy while Burns' case was not.

Respondent moves for summary judgment on this claim on the grounds that counsel made a reasonable, albeit risky, tactical decision to call Wagstaffe to the stand.  He asserts that through Wagstaffe's testimony, the jury learned that the prosecution considered others responsible for the murders, not just petitioner.  Respondent alleges that this invited the jury to view petitioner in the same light as others involved in the murders.

Respondent is correct.  Wagstaffe testified that several factors played a role in the decision not to seek the death penalty in Burns' case:  her reduced level of involvement in the murders, background, age and domination by petitioner (Tr. 9761–63).  Although the jury learned through Wagstaffe that he considered her less accountable than petitioner, his testimony also served the defense objective of distributing guilt rather than have petitioner shoulder entire responsibility for the crimes.

An independent review of the record reveals that the state court decision with respect to subclaim C was not objectively unreasonable.  Accordingly, summary judgment on this subclaim is **GRANTED** in favor of respondent.

*(4)      Subclaim D.*

Petitioner alleges that Attorney Gray was ineffective for failing to investigate and challenge an actual conflict of interest on the part of petitioner's trial judge, Gerald E. Ragan, arising from Judge Ragan's past representation of petitioner's ex-wife in dissolution proceedings.  Judge Ragan had filed papers on her behalf alleging that petitioner had inflicted cruelty and mental suffering on his client.  Petitioner alleges that counsel should have moved for

33

United States District Court

For the Northern District of California

1    Judge Ragan's disqualification pursuant to California Code of Civil Procedure § 170.1(a)(1)

2    ("a judge shall be disqualified if . . . the judge has personal knowledge of disputed evidentiary

3    facts concerning the proceeding") and § 170.1(a)(6)(C) ("a person aware of the facts might

4    reasonably entertain a doubt that the judge would be able to be impartial").

5          Respondent moves for summary judgment on this claim on the grounds that petitioner

6    cites only state law grounds for the justification of recusal and fails to meet even those grounds.

7    He asserts that the state court reasonably denied this subclaim.  Petitioner fails to address

8    respondent's arguments.

9          Respondent is correct.  As noted in the discussion of claim 7 above, in order to establish

10   a violation of the Sixth Amendment based on a conflict of interest, a habeas petitioner must show

11   that an actual conflict of interest adversely affected his lawyer's performance.  *Cuyler*, 446 U.S.

12   at 348, 350.  An "actual conflict of interest" only occurs when counsel "actively represented

13   conflicting interests."  *Strickland*, 466 U.S. at 692.   Here, petitioner fails to establish a

14   constitutional violation.

15         Moreover, petitioner ignores that fact that when Judge Ragan's past representation of

16   petitioner's ex-wife was brought to his attention by petitioner's counsel, Judge Ragan could not

17   even remember representing her (Tr. 4635).  Judge Ragan therefore would not have been biased,

18   or in possession of relevant evidentiary facts, as relevant to petitioner's state law allegations.

19   *See* California Code of Civil Procedure § 170.1(a)(1), (a)(6)(C).  Petitioner's counsel reasonably

20   stated that he therefore "consider[ed] the matter to be of no moment" (Tr. 4636).

21         An independent review of the record reveals that the state court denial of this subclaim

22   was not objectively unreasonable.  Summary judgment on subclaim 9(D) is **GRANTED** in favor

23   of respondent.

24                    *(5)    Subclaim E.*

25         This subclaim alleges that trial Attorney Gray was ineffective for failing to object to

26   numerous instances of prosecutorial misconduct during the guilt- and penalty-phase closings, as

27   outlined in claim 15.  He asserts that the prosecutor improperly vouched for witnesses, injected

28

personal opinion, misstated the evidence and relied on non-statutory aggravating factors at the

penalty phase.

Respondent moves for summary judgment on this subclaim on the grounds that the state

court reasonably denied petitioner's allegations of prosecutorial misconduct.  Addressing alleged

prosecutorial misconduct in the guilt-phase, the state court stated:

> Defendant faults the prosecutor for arguing facts outside the record in several instances, including the following:  "vaginal tears" are unusual for a prostitute; Michael Shing "came forward" as a witness when in fact he had been arrested before deciding to make a statement; police tested the fingerprints of over 200 people before Shing's statement; Shing testified one murder had taken place in the warehouse (he actually stated it happened in the living quarters in the warehouse building); government payments were made to Shing because his life was in jeopardy (Shing testified to fearing for his life and had told police of his fears); Livingston had testified in four preliminary hearings (the correct number was two); defendant told police he had last seen Barbara Searcy at the Sheraton Hotel (the only evidence suggested he saw her at the warehouse); and defendant said he never saw Searcy drive a Peugeot (he acknowledged seeing her drive a blue sports car, which happened to be a Peugeot).  Finally, defendant claims the prosecutor falsely accused him of possessing a silencer, when in fact he testified he was merely "making" one.  Each of the remarks cited represents either fair characterizations of the evidence permissible in final argument or minor misstatements of marginally relevant matters that could easily have been corrected by an objection and admonition.  Whether considered or in the aggregate, they had no conceivable impact and were, at most, harmless prosecutorial hyperbole.
>
> The same can be said of the defendant's further citations of misconduct, *i.e.*, that the prosecutor vouched for the credibility of certain witnesses.  Considered in context, almost all of the examples cited amounted to argument from the facts in the record directed to the credibility of witnesses, not the personal statement of the prosecutor vouching for their credibility.  Such argument is proper.  No misconduct occurred.  The one personalized reference — a remark that the prosecutor had not deceived the jury and would not lie to it — was brief, innocuous and followed immediately by references to evidence bearing on witness credibility.  There was no conceivable prejudice to defendant in the remark.
>
> Finally, defendant argues the prosecutor appealed to the passions and prejudices of the jury by suggesting, based on his analysis of the evidence and the defense argument, that defendant must think the jurors were "fools" and "buffoons."  These comments came as part of the prosecutor's critical review of the defense evidence.
>
> We have upheld the use of "appropriate epithets warranted by the evidence."  Final argument can be "vigorous and may include

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

opprobrious epithets reasonably warranted by the evidence."
We have also held that the prosecutor may characterize a
defendant's testimony as lies, so long as the inference is based on
the evidence rather than the prosecutor's personal knowledge or
experience.

Judged against our cases, the prosecutor's characterizations of
defendant and his conduct were a permissible comment on the
evidence.  But, even if they were improper, any conceivable harm
could have been corrected by timely objection.  In any event, they
were not sufficiently serious to constitute prejudicial misconduct.

*Sully*, 53 Cal. 3d at 1235–36 (internal citations omitted).  Addressing alleged prosecutorial

misconduct in the penalty phase, the state court further stated:

[D]efendant faults the prosecutor for attempting to use defendant's
cocaine addiction as an aggravating factor.  The prosecutor argued
that defendant was not impaired by the use of cocaine, that he
functioned well during his use of it, and that, "if anything, the
cocaine effectively enhanced this desire to abuse people, sexually
abuse them and ultimately kill them."  The prosecutor's argument
was supported by testimony from a defense expert who
acknowledged that cocaine users like defendant remain fully aware
of their conduct.  It was also supported by testimony from
defendant himself, who acknowledged that he considered himself a
"sex fiend" while freebasing and that he "liked to be with
prostitutes and do dope.  Chase women and do dope."  Thus, the
prosecutor was pointing to a connection between cocaine and
defendant's sexual desires that defendant himself admitted.
Nor did the prosecutor's remarks turn cocaine addiction into an
aggravating factor.  Considered in context, the prosecutor was
merely arguing that factor (h) in section 190.3 (impairment as a
result of intoxication) did not apply in this case.

Defendant also asserts the prosecutor relied on nonstatutory
aggravating factors in his argument, including defendant's:
(1) lack of remorse and conscience as shown by the manner of the
killings; (2) "explosive disposition" as manifested by the testimony
of his brother, his conduct in the courtroom, and other evidence of
violence; and (3) established penchant for violence, as "a
disservice to others" in society.  We detect no prejudice to
defendant in these remarks.  The references to lack of remorse and
conscience were part of a factual discussion of the circumstances
of defendant's crimes, an aggravating factor.  (§ 190.3, factor (a)).
Defendant's conduct in the courtroom was but one example of his
"explosive disposition"; the record contained abundant evidence of
past violence which an inference of future violence could properly
be drawn.  There was neither misconduct nor prejudice in these
remarks.

In addition, defendant charges the prosecutor with misconduct in
pointing to defendant's activities in fashioning a silencer and in
arguing that defendant "would have continued to kill absent his
arrest."  The evidence supports the prosecutor's argument on
both counts.  Defendant had procured a pamphlet on silencers.

United States District Court

For the Northern District of California

> He conceded on the stand at the guilt phase that he had ground down the sight on his gun as part of an "experiment" involving the manufacture of a silencer. Moreover, the number and pattern of defendant's crimes permitted an inference that similar conduct could be expected in the future. No misconduct occurred.
>
> Finally, defendant alleges the prosecutor made unfounded derogatory remarks about him, referring to facts of his crimes and calling him a "human monster" and a "mutation." There was no misconduct in the prosecutor's remarks. As we have observed in connection with guilt phase argument, the use of these kinds of terms can constitute permissible comment regarding egregious conduct on defendant's part. That was the case here. Even if the use of these characterizations could be viewed as misconduct, defendant suffered no prejudice. An objection and admonition would have cured any error; defendant made no objection. Moreover, the prosecutor's exaggerated expressions were brief and isolated instances, and emanated from the heinous details of defendant's crimes and defendant's own statements about his conduct.

*Id*. at 1248–50 (internal citations omitted).

This order concurs with the state court's findings that the prosecutor's comments either constituted permissible comments on the evidence, did not amount to misconduct, or did not result in prejudice. Accordingly, this order discerns neither deficient performance nor prejudice resulting from trial counsel's failure to object to the prosecutor's arguments. Summary judgment on subclaim E is **GRANTED** in favor of respondent.

### *(6)    Subclaim F.*

Petitioner alleges that he was denied a constitutional determination of penalty due to trial counsel's failure to adequately cross-examine the prosecution's penalty-phase witnesses Donna Skalisky, Jean Marsala and Marie Williams. As noted in the discussion of claim 3, all three witnesses testified about petitioner's alleged killing of Skalisky's daughter's ducks after she and petitioner decided to divorce. Skalisky's daughter and her grandmother discovered the ducklings in the backyard. The ducklings' heads had been ripped off. Petitioner alleges that trial counsel also failed to locate and present a witness who observed the scene of the duck killings a day after the incident.

Respondent moves for summary judgment on this claim on the grounds that trial counsel's actions were based on reasonable tactical decisions. For the reasons set forth below, the Court agrees with respondent.

Petitioner alleges that trial counsel should have cross-examined Skalisky regarding her lack of knowledge as to the precise cause of the ducks' deaths. Petitioner, however, later presented evidence that racoons killed other ducks in the neighborhood (Tr. 9093). This raised the same doubt concerning the ducks' cause of death that could have been raised through the cross-examination of Skalisky. The same objective was thus accomplished without asking Skalisky how she knew that petitioner had killed the ducks.

With respect to Marsala, petitioner alleges that she had previously reported to the police that he had a split personality — that he could be "as good as gold" or a raving maniac. Petitioner alleges that trial counsel failed to follow up on her "good as gold" comment. Doing so, however, could have brought out specific information behind Marsala's belief that petitioner could be a raving maniac. Trial counsel reasonably declined to open the door to such testimony.

Petitioner next faults trial counsel for failing to question Marsala and Williams about their biases and their abilities to identify his voice over the phone. Marsala testified that petitioner made threatening phone calls to Skalisky when she stayed with Marsala the week after she moved out of his home. Williams testified that petitioner made threatening phone calls to Skalisky at work. Petitioner does not set forth any reason for disbelieving Marsala's and Williams' testimony. Furthermore, since the jury already knew of the witnesses' relation to Skalisky, it was reasonable for counsel to allow the jury to infer any possible bias on their part.

Finally, petitioner faults trial counsel for failing to present a witness, Annetta Giambruno, who knew petitioner and observed the scene of the duck killings the day after the incident. According to Giambruno's declaration (Pet.'s Exh. 66), the scene in the backyard led her to believe that the ducks may have been killed by an animal rather than a human being. Testimony to this effect however, would have been both speculative and cumulative. As noted above, petitioner presented evidence that racoons killed other ducks in the neighborhood. Failure to present Giambruno as a witness did not prejudice petitioner.

United States District Court
For the Northern District of California

1    An independent review of the record reveals that the state court decision with respect to

2    subclaim F was not objectively unreasonable.  Accordingly, summary judgment on this subclaim

3    is **GRANTED** in favor of respondent.

4                                      *(7)     Subclaim G.*

5         Petitioner alleges that Attorney Gray was ineffective for failing to adequately

6    cross-examine prosecution witness Michael Shing regarding the benefits he would receive

7    in exchange for his testimony against petitioner.  Shing was an escort owner to whom

8    petitioner confided that he had murdered a pimp and his prostitute and stuffed their bodies into

9    barrels.  Shing testified that he received $8,000, and an additional $1,800 at a later date, from the

10   prosecution in connection with his testimony at petitioner's trial.  Petitioner alleges, however,

11   that trial counsel was ineffective for failing to delve deeper into further benefits Shing would

12   receive in exchange for his testimony.  He asserts that counsel failed to ask Shing whether there

13   was a deal with the prosecution whereby pending rape charges against him would be dismissed

14   and his probation would not be revoked despite the fact that the rape charges constituted a

15   violation of his probation.

16        Respondent moves for summary judgment on this subclaim on the grounds that counsel

17   was not ineffective for failing to cross-examine Shing regarding a speculative agreement, and

18   that petitioner did not suffer any prejudice.

19        Respondent is correct.  Petitioner presents no evidence that the alleged agreement

20   between Shing and the prosecution existed.  Counsel was not ineffective for failing to inject

21   unsupported speculation into the trial.

22        An independent review of the record reveals that the state court decision with respect to

23   subclaim G was not objectively unreasonable.  Accordingly, summary judgment on this subclaim

24   is **GRANTED** in favor of respondent.

25                                     *(8)     Subclaim H.*

26        Petitioner asserts that Attorney Gray was ineffective for failing to obtain and review the

27   transcripts and exhibits of Michael Francis' trial.  Francis was charged and convicted of the

28   first-degree murder of Kathryn Barrett.  Petitioner was also charged with her homicide.

                                            39

United States District Court

For the Northern District of California

In preparation for Francis' trial, his counsel created a video of Francis giving his account of the Barrett homicide. The video was made while Francis was under the influence of sodium amytal, a "truth" serum. Petitioner alleges that to the extent that Michael Francis' version of the Barrett homicide differed from the version of events outlined by Tina Livingston, the main witness against petitioner at trial, that information could have been used as impeachment evidence or relied on for further investigative leads.

Respondent moves for summary judgment on this subclaim on the grounds that petitioner fails to establish that Francis' version of events was, in fact, different in a material, exculpatory way. Respondent asserts that petitioner thus fails to demonstrate prejudice. Respondent further requests that the Court take judicial notice of Francis' trial and appellate proceedings.

Respondent is correct. Petitioner fails to demonstrate that the Francis' version of events would have been exculpatory. Moreover, Francis' video would probably have been excluded in state court as being inherently unreliable. *See People v. Jones*, 52 Cal. 2d 636, 653 (1959) (courts have found sodium amytal tests inadmissible against a defendant because of the lack of scientific certainty about the results).

An independent review of the record reveals that the state court decision with respect to subclaim H was not objectively unreasonable. Accordingly, summary judgment on this subclaim is **GRANTED** in favor of respondent. The dismissal of this subclaim renders respondent's request for judicial notice moot.

### *(9) Subclaim I.*

Petitioner asserts that Attorney Gray was ineffective for failing to object to the introduction of evidence regarding his alleged killing of ducklings and placement of threatening phone calls to his ex-wife. He alleges that counsel's failure to present argument regarding the admissibility of this evidence resulted in prejudice.

Respondent moves for summary judgment on this subclaim on the ground that this Court has already found it to be barred by *Teague v. Lane*, 489 U.S. 288 (1989). The non-retroactivity principle announced in *Teague* prevents a federal court from granting habeas relief to a state prisoner based on a constitutional rule of criminal procedure announced after his conviction and

United States District Court

For the Northern District of California

1  sentence became final.  *See Teague*, 489 U.S. at 310–16.  Respondent asserts that if this subclaim

2  is *Teague*-barred, then there clearly does not exist any United States Supreme Court precedent

3  mandating relief in petitioner's favor.  Petitioner does not address respondent's argument in his

4  opposition.

5      Respondent is correct.  The record does not support the ineffective assistance allegations

6  asserted in this subclaim.  The state court decision with respect to subclaim I was not objectively

7  unreasonable.  Accordingly, summary judgment on this subclaim is **GRANTED** in favor of

8  respondent.

9              *(10)    Subclaim J.*

10     Petitioner alleges that Attorney Gray was ineffective for failing to move to quash the

11  search warrant for the May 1983 search of his premises and suppress evidence resulting from

12  both the May and August 1983 searches based upon available constitutional challenges.

13  He asserts that the warrants for both the May and August 1983 searches were overbroad and

14  lacked probable cause.

15     Respondent moves for summary judgment on this subclaim on the grounds that not only

16  is it an attempt to circumvent the United States Supreme Court's pronouncement that Fourth

17  Amendment challenges are not cognizable on habeas, *see Stone v. Powell*, 428 U.S. 465 (1976),

18  but also fails on the merits because it fails to explain how exactly the warrants were overly broad

19  or lacked probable cause.  Petitioner does not address respondent's arguments in his opposition.

20     Contrary to respondent's assertion, Sixth Amendment claims with respect to Fourth

21  Amendment issues may be the basis of a habeas action and are not barred by *Stone v. Powell*.

22  *See Kimmelman v. Morrison*, 477 U.S. 365, 373–83 (1986).  An independent review of the

23  record however, does not support the ineffective assistance allegations asserted in this subclaim.

24  Petitioner fails to demonstrate that the warrants were overly broad or lacked probable cause.

25  The state court decision with respect to subclaim J was not objectively unreasonable.

26  Summary judgment on this subclaim is **GRANTED** in favor of respondent.

27

28

41

### *(11)* *Subclaim K.*

Petitioner alleges that Attorney Gray was ineffective for failing to present an independent forensic expert to refute the prosecution's evidence demonstrating that victims Gloria Fravel and Kathryn Barrett suffered great pain before they died.  On the basis of evidence showing that Fravel had gravel lodged in her throat, the prosecution argued that Fravel was not dead when she was left on the side of the road.  The prosecution further argued that burns found on Barrett's thigh occurred prior to her death.

Respondent moves for summary judgment on this subclaim on the grounds that counsel made a tactical decision to minimize evidence of the victims' suffering.  He asserts that given that petitioner was denying all guilt, it was reasonable for counsel to choose not to highlight the issue of the victims' suffering by producing additional witnesses.

A review of the record reveals that trial counsel did in fact cross-examine the prosecution's forensic witnesses regarding the manner of Fravel's and Barrett's deaths (Tr. 4856–57, 4854).  Counsel also suggested alternative theories as to how the victims' injuries may have occurred post-mortem.  Counsel was not ineffective for declining to attract further attention to this issue by presenting forensic experts for the defense.  The state court decision with respect to this subclaim was not objectively unreasonable.

For the above reasons, summary judgment on subclaim K is **GRANTED** in favor of respondent.

### *(12)* *Subclaim L.*

Petitioner alleges that Attorney Gray was ineffective for failing to move for the exclusion of portions of his taped interrogation by the San Mateo County Sheriff's Department on August 24, 1983, and August 31, 1983.  These tapes included instances of petitioner invoking his Fifth Amendment privilege in response to questioning.  Petitioner alleges that counsel should have objected to the admission of the questions and answers with respect to which he invoked his Fifth Amendment.

Respondent moves for summary judgment on this subclaim on the grounds that petitioner cites no authority for the requirement that counsel object to statements showing petitioner's invocation of his Fifth Amendment rights. He asserts that this subclaim lacks merit.

Respondent is correct. In addressing the facts underlying claim, the Supreme Court of California stated:

> [D]efendant maintains the prosecution made improper use of his invocation of his right to remain silent by introducing parts of his tape-recorded statements in which he had refused to answer questions, and by commenting on his responses in final argument. Initially, defendant does not point to any objection to the prosecutor's conduct. As a result, his arguments are deemed waived. (Evid. Code, § 353). In addition, the record reveals that defendant voluntarily consented to interrogation and then selectively refused to answer certain questions on grounds that, *e.g.*, he was not a stool pigeon or he was unwilling to put his foot in his mouth. In closing argument, the prosecutor commented on inconsistencies between defendant's pretrial statements and his trial testimony.
>
> A defendant cannot consent to be interrogated and then select the portions of the interrogation that will be used at his trial. The record does not reveal that any admission made by defendant *after* he had invoked *Miranda* rights was admitted at this trial. Defendant does not demonstrate that his constitutional or other legal rights were in any way violated in this case.

*Sully*, 53 Cal. 3d at 1252.

Petitioner fails to demonstrate that counsel had a duty to move for the exclusion of those portions of the tape which document petitioner's mere invocation of his Fifth Amendment rights. As the state court pointed out, the record does not demonstrate that any admission made by petitioner *after* he invoked his Fifth Amendment rights was admitted at trial. Petitioner fails to demonstrate that counsel's inaction constituted deficient performance or resulted in prejudice.

The Court concludes that the state court decision with respect to subclaim L was not objectively unreasonable. Summary judgment on this subclaim is **GRANTED** in favor of respondent.

### (13)    Subclaim M.

Petitioner alleges that Attorney Gray was ineffective for failing to object to the prosecution's repeated references to his invocation of his Fifth Amendment right not to incriminate himself and have counsel present during interrogations. He asserts that when

United States District Court

For the Northern District of California

1  Sergeant Morse of the San Mateo County Sheriff's Department took the stand, the prosecution

2  elicited information from him regarding petitioner's refusal to answer questions during

3  interrogations.  He further asserts that during closing argument, the prosecution improperly

4  commented on his invocation of his constitutional right to remain silent.  Petitioner argues that

5  trial counsel's failure to object to Morse's testimony and the prosecution's closing argument

6  constituted ineffective assistance.

7  Respondent moves for summary judgment on this subclaim on the grounds that petitioner

8  fails to demonstrate that trial counsel's inaction resulted in prejudice.  He asserts that this

9  subclaim lacks merit.

10  Respondent is correct.  Petitioner fails to establish that he was prejudiced by counsel's

11  lack of objection.  The state court decision with respect to subclaim M was not objectively

12  unreasonable.  Summary judgment on this subclaim is **GRANTED** in favor of respondent.

13  **H.    Claim 10.**

14  Petitioner alleges that he was denied his right to the effective assistance of mental health

15  experts during the guilt, special circumstance and penalty phases of his trial.  He asserts that he

16  was not provided a mental health expert to evaluate potential guilt-phase mental-state defenses,

17  the presence of mitigating factors and absence of aggravating factors, as well as his competency

18  to stand trial.  Petitioner alleges that this resulted in a violation of his constitutional rights.

19  He cites *Ake v. Oklahoma*, 470 U.S. 68 (1985), in support of this claim.  Petitioner raised this

20  claim in his state habeas petition.  The Supreme Court of California denied it without a reasoned

21  opinion (Pet.'s Exh. C-6).

22  Respondent moves for summary judgment on this claim on the grounds that *Ake* does not

23  support petitioner's claim.  He asserts that the Supreme Court of California's denial of this claim

24  was reasonable.

25  Respondent is correct.  In *Ake*, 470 U.S. at 83, the United States Supreme Court held

26  that the Constitution requires a trial court to appoint a psychiatric expert to assist an indigent

27  capital defendant when sanity will be a significant factor in determining the defendant's guilt.

28  The Court was concerned with providing indigent defendants with the basic tools of an adequate

United States District Court

For the Northern District of California

1    defense and meaningful access to justice. *Id*. at 77. Here however, petitioner had access to

2    mental health experts. Dr. Grossi provided supported supportive therapy during trial and Dr.

3    Elin performed a psychological evaluation. Furthermore, petitioner's sanity was not an issue at

4    all, much less a significant issue. Petitioner's reliance on *Ake* is misplaced.

5         The state court decision with respect to claim 10 was not objectively unreasonable.

6    Summary judgment on this claim is **GRANTED** in favor of respondent.

7                              **I.        Claim 11.**

8         Petitioner alleges that he was incompetent to stand trial and waive certain fundamental

9    rights. He asserts that his background, mental illness and substance abuse prevented him

10   from understanding the proceedings and aiding trial counsel in a meaningful manner.

11   Petitioner further claims that he was incompetent to waive his right to be present during the

12   penalty phase, to have instructions regarding lesser-included offenses given during the

13   guilt-phase instructions, to conflict-free representation, and to waive his Fifth Amendment rights

14   when he was interrogated by the San Mateo County Sheriff Department's detectives on the night

15   that he was arrested. Petitioner advances Dr. Woods' declaration in support of this claim.

16   Petitioner raised this claim in his state habeas petition. The Supreme Court of California denied

17   it without a reasoned opinion (Pet.'s Exh. C-6).

18        Respondent moves for summary judgment on this claim on the grounds that petitioner

19   was in fact competent to stand trial. He argues that the Supreme Court of California reasonably

20   denied this claim.

21        The test for competence to stand trial is "whether the defendant has 'sufficient present

22   ability to consult with his lawyer with a reasonable degree of rational understanding — and

23   whether he has a rational as well as factual understanding of the proceedings against him.'"

24   *See Boag v. Raines*, 769 F.2d 1341, 1343 (9th Cir. 1985) (citing *Dusky v. United States*, 362 U.S.

25   402, 402 (1960), and *Chavez v. United States*, 656 F.2d 512, 518 (9th Cir. 1981)), *cert. denied*,

26   474 U.S. 1085 (1986). A state may presume that a defendant is competent and require him to

27

28

United States District Court
For the Northern District of California

prove his incompetence by a preponderance of the evidence.  *Cooper v. Oklahoma*, 517 U.S.

348, 354 (1996).  This burden is important:

> In cases finding sufficient evidence of incompetency, the petitioners have been able to show either extremely erratic and irrational behavior during the course of the trial, *e.g.*, *Tillery v. Eyman*, 492 F.2d 1056,1057–58 (9th Cir. 1974) (defendant screamed throughout the nights, laughed at the jury, made gestures at the bailiff, disrobed in the courtroom and butted his head through a glass window), or lengthy histories of acute psychosis and psychiatric treatment, *e.g., Moore v. United States*, 464 F.2d 663, 665 (9th Cir. 1972) (defendant repeatedly hospitalized for acute mental illness and hallucinations).

*Boag*, 769 F.2d at 1343.

A review of the record, including the proffer, does not reveal any substantial evidence of incompetence.  Petitioner was examined by two experts, Dr. Grossi and Dr. Elin.  Dr. Grossi provided petitioner with supportive therapy during trial (Pet.'s Exh. 9 at 1).  Dr. Elin performed a psychological evaluation to determine his "level of psychological functioning" (Pet.'s Exh. 10 at 1).  He diagnosed petitioner to have "narcissistic character disorder with an underlying borderline organization."  *Id*. at 18.  Although Dr. Grossi and Dr. Elin did not examine petitioner for purposes of determining whether he was competent to stand trial, neither one raised any questions in this regard.  Furthermore, petitioner testified coherently and at great length during trial.  His testimony remained consistent with accounts he provided to the police and others, and did not reflect a lack of understanding of the proceedings against him.  Nothing in the record suggests that petitioner was unwilling or unable communicate with counsel.  Even petitioner's vitriolic outburst when the guilty verdict was read, though laden with insults and profanities directed at the jury, demonstrated coherence (Tr. 9041–42).

Petitioner supports his allegation of incompetence primarily with the after-the-fact declaration of Dr. Woods.  Based on a variety of facts, including petitioner's inability to recall events surrounding the homicides he was charged with, his letters to trial counsel, Dr. Elin's psychological test and records from Chope Community Hospital, Dr. Woods opines that petitioner in fact was not competent to stand trial (Pet.'s Exh. 3 at 24–30).  Petitioner asserts that this declaration casts doubt on petitioner's ability to rationally assist and prepare his defense.

As respondent points out, Dr. Woods' declaration merely provides the opinion of an expert assessing petitioner's competence in 1997, many years after his trial and conviction. Retrospective determinations of incompetence however, are disfavored, and substantial weight is accorded to the lack of contemporaneous evidence of a petitioner's competence to stand trial. *Williams v. Woodford*, 384 F.3d 567, 608 (9th Cir. 2004).  Here, petitioner offers no contemporaneous evaluation of petitioner establishing his incompetence to stand trial. Significantly, petitioner's own counsel at the time of trial did not raise the issue of his competence.  *Hernandez v. Ylst*, 930 F.2d 714, 718 (9th Cir. 1991) (the fact that defense counsel considered the defendant competent to stand trial was significant evidence that the defendant was competent).

Under the 28 U.S.C. 2254(d), the state court's findings of fact are entitled to a presumption of correctness.  *See also Maggio v. Mulford*, 462 U.S. 111, 117 (1983) (assuming that competency is a factual determination entitled to a presumption of correctness). The petitioner must rebut this presumption by clear and convincing evidence, and a federal court may not issue a writ unless the petitioner can demonstrate by such evidence that the state decision was based on an incorrect determination of the facts.  Given the combined weight of the presumption of correctness and the high burden of proof necessary to establish incompetence, petitioner has failed to demonstrate that the state court erred in denying his competency claim. Petitioner has likewise failed to demonstrate that the state court erred in denying his corollary claims of incompetence to waive various other rights outlined above.

For the above-mentioned reasons, summary judgment on claim 11 is **GRANTED** in favor of respondent.

### J.        Claim 14.

Petitioner alleges that the trial court denied his right to due process by failing to institute competency proceedings sua sponte.  He asserts that during the trial, the court had ample opportunity to observe his demeanor and was aware of his irrational behavior since it witnessed his verbal outburst when the guilty verdict was read.  Petitioner alleges that the trial court was under a duty to order an investigation of his mental condition pursuant to California Penal Code

Sections 1367, *et seq.*  He advances the Woods and Nolan declarations in support of this claim.
Petitioner raised this claim in his state habeas petition.  The Supreme Court of California denied
it without a reasoned opinion (Pet.'s Exh. C-6).

Respondent moves for summary judgment on this claim on the grounds that evidence
does not support petitioner's allegations of incompetence.  He argues that the Supreme Court of
California reasonably denied this claim.

Due process requires a trial court to order a psychiatric evaluation or conduct a
competency hearing if the court has a good faith doubt concerning the defendant's competence.
*See Cacoperdo v. Demosthenes*, 37 F.3d 504, 510 (9th Cir. 1994).  A good faith doubt about a
defendant's competence arises only if there is substantial evidence of incompetence.  *Ibid*.
Several factors are relevant to determining whether a hearing is necessary, including evidence of
a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on
competence to stand trial.  *See United States v. Loyola-Dominguez*, 125 f.3d 1315, 1318 (9th Cir.
1997).

As noted in the discussion of claim 11, the record does not reflect any substantial
evidence of petitioner's incompetence.  There is no indication of irrational courtroom behavior
or oddities in petitioner's demeanor.  Petitioner's outburst when the guilty verdict was read
reflected anger, but did not demonstrate incompetence.  Furthermore, Attorney Nolan's
declaration addressing the standard of practice in 1986 for the preparation of a motion
challenging a defendant's competency to stand trial does not raise a good faith doubt about a
petitioner's competence (Pet.'s Exh. 2 at 21–25).  Petitioner's allegations lack merit.

For the above-mentioned reasons, summary judgment on this claim is **GRANTED** in favor
of respondent.

### K.      Claim 17.

Petitioner alleges that the prosecution engaged in misconduct when it rendered Angel
Burns unavailable to testify as a defense witness by manipulating charges against her.
On December 8, 1983, Burns was charged with aiding petitioner in the homicides of Oakden,
Thomas and Melendrez.  On August 13, 1984, the day that her trial was supposed to begin, the

United States District Court

For the Northern District of California

prosecution dismissed these charges and recharged her with the first degree murder of two of the victims as well as special circumstance allegations of multiple murder, and added the homicide of Gloria Fravel with special circumstance allegations.  In so doing, petitioner alleges that the prosecution created a situation whereby Burns became unavailable as a witness due to her invocation of her Fifth Amendment privilege based on her pending trial on some of the same charges that petitioner faced.  Had Burns' trial gone forward as originally expected, she would no longer have maintained a Fifth Amendment privilege by the time of petitioner's trial. Petitioner asserts that he was prejudiced by this alleged manipulation in that Burns would have testified that Tina Livingston killed Fravel, and that petitioner did not kill Melendrez. Petitioner presented this claim to the Supreme Court of California in his state habeas petition. The state court denied it without a reasoned opinion (Pet.'s Exh. C-6).

Respondent moves for summary judgment on this claim on the grounds that petitioner fails to establish that the prosecution abused its discretion in dismissing accessory charges against Burns and then recharging her with three murders, or that Burns would have provided exculpatory testimony at his trial.  He asserts that the state court reasonably denied this subclaim. Petitioner fails to address respondent's arguments.

Respondent is correct.  Prosecutors have broad discretion in deciding whom to charge for what crime.  *See United States v. Miller*, 722 F.2d 562, 564 (9th Cir. 1983) (in charging decisions, a prosecutor's discretion is almost absolute); *People v. Lucas*, 12 Cal. 4th 415, 478 (1995) ("the factual predicates for a prosecutor's charging decision should not be subject to scrutiny unless there is a claim of invidious discrimination or vindictive prosecution"). Petitioner fails to demonstrate that the prosecution abused its discretion, let alone violated his constitutional rights, in charging Burns with crimes to which, incidentally, she later pled guilty.

The state court denial of this claim was not objectively unreasonable.  Summary judgment on claim 17 is **GRANTED** in favor of respondent.

### L.   Claim 18.

Petitioner alleges that the prosecution wrongfully withheld numerous items of material and exculpatory evidence.  This claims consists of five subclaims.  Petitioner presented this

United States District Court

For the Northern District of California

1    claim to the Supreme Court of California in his state habeas petition.  The state court denied it

2    without a reasoned opinion (Pet.'s Exh. C-6).

3         In general, the "suppression by the prosecution of evidence favorable to an accused upon

4    request violates due process where the evidence is material either to guilt or punishment,

5    irrespective of the good faith or bad faith of the prosecution."  *Brady v. Maryland*, 373 U.S. 83,

6    87 (1963).  "The evidence is material only if there is a reasonable probability that, had the

7    evidence been disclosed to the defense, the result of the proceeding would have been different."

8    *United States V. Bagley*, 473 U.S. 667, 682 (1985).  The materiality of suppressed evidence is

9    considered cumulatively, not item by item.  *Kyles v. Whitley*, 514 U.S. 419, 436 (1995).

10   Accordingly, although each of petitioner's subclaims is reviewed separately, the impact of the

11   non-disclosed evidence is considered cumulatively.

12                    *(1)     Subclaim A.*

13        Petitioner alleges that the prosecution's failure to turn over surveillance records

14   documenting undercover attempts to purchase drugs from him violated his constitutional rights.

15   At a pretrial hearing in July 1985, Commander Chase of the Burlingame Police Department

16   revealed that his department had been conducting a narcotics investigation of petitioner, and that

17   several undercover attempts to buy drugs from him were taped.  Petitioner alleges that these

18   tapes most likely documented unsuccessful attempts to purchase drugs from him, and were

19   therefore exculpatory in that they defeated the prosecution theory that he was a drug dealer.  He

20   further claims that the surveillance records may have provided an alibi, or evidence that he was

21   under the influence of drugs at relevant times.

22        Respondent moves for summary judgment on this subclaim on the grounds that petitioner

23   fails to show that the surveillance records would have exculpated him.  He asserts that the state

24   court reasonably denied this subclaim.  Petitioner fails to address respondent's arguments.

25        Respondent is correct.  The prosecution theory with respect to several of the murders

26   was not that petitioner was a drug dealer, but that petitioner "ripped off" drug dealers.

27   The surveillance records, as described by petitioner, therefore were not relevant to the

28   prosecution's case.  Furthermore, any evidence of intoxication was similarly irrelevant since his

United States District Court

For the Northern District of California

1    defense was one of factual innocence.  Petitioner fails to demonstrate that the surveillance

2    records would have exculpated him.

3        Petitioner's allegation that the surveillance records may have provided an alibi also lacks

4    merit.  Because petitioner fails to provide any specificity as to this assertion, his argument fails.

5    *See Jones v. Gomez*, 66 F.3d 199, 204 (9th Cir. 1995) (conclusory allegations which are not

6    supported by a statement of specific facts do not warrant habeas relief).

7        The state court denial of this subclaim was not objectively unreasonable.

8    Summary judgment on claim 18(A) is **GRANTED** in favor of respondent.

9                              *(2)    Subclaim B.*

10       Petitioner alleges that the prosecution's failure to turn over FBI test results of the cement

11   used to seal the tops of the barrels in which three of the victims were discovered was prejudicial

12   because the results showed that cement from the barrels did not match the cement found at his

13   warehouse.  He suggests that this provides strong support for the defense theory that the barrels

14   were brought to the warehouse, already sealed with the bodies in them, when petitioner touched

15   the top of the concrete, leaving a fingerprint.

16       Respondent moves for summary judgment on the grounds that the test results do not

17   support petitioner's allegations.  He asserts that the state court reasonably denied this subclaim.

18   Petitioner fails to address respondent's arguments.

19       Respondent is correct.  The test results merely show that none of the cement found at

20   the warehouse when petitioner was arrested in August 1983 matched the cement used to seal

21   the barrels months earlier.  The results do not cast any light on circumstances surrounding the

22   murders, or on whether petitioner destroyed evidence or cleaned his warehouse after the

23   murders.  Nor do the results exculpate petitioner from being involved in the murders.

24   Petitioner's allegations to the contrary lack merit.

25       The state court denial of this subclaim was not objectively unreasonable.

26   Summary judgment on claim 18(B) is **GRANTED** in favor of respondent.

27

28

**United States District Court**
For the Northern District of California

### (3)    *Subclaim C.*

Petitioner faults the prosecution for failing to turn over additional information regarding "Cookie," a female prostitute who allegedly said she knew who killed Michael Thomas and Phyllis Melendrez, and Sam "Spade" Washington, a drug dealer who allegedly threatened to kill Thomas.  (Cookie and Thomas are further discussed in claim 8, above.)  He alleges that the prosecution failed to reveal information that would have permitted further investigation of Cookie and Washington.

Respondent moves for summary judgment on this subclaim on the grounds that petitioner fails to establish the exculpatory nature of the potential testimony of Cookie and Washington. He asserts that the state court reasonably denied this subclaim.  Petitioner fails to address respondent's arguments.

Respondent is correct.  Conspicuously absent from the petition are any allegations that the prosecution actually possessed any exculpatory information pertaining to Cookie and Washington.  Furthermore, petitioner fails to establish that the timing of Washington's alleged threat coincided with Thomas' death, that Washington ever followed through on the threat, or that the threat was credible in the first place.  Similarly, there is no evidence that Cookie would not have identified petitioner as the killer of Thomas and Melendrez.  Petitioner's claim lacks merit.

The state court denial of this subclaim was not objectively unreasonable. Summary judgment on claim 18(C) is **GRANTED** in favor of respondent.

### (4)    *Claim D.*

Petitioner faults the prosecution for failing to turn over a video tape made by Michael Francis' defense team in preparation for his own trial for the murder of Kathryn Barrett. As explained in the discussion of subclaim 9(H) above, the video was made while Francis was under the influence of sodium amytal, a "truth serum."  After the conclusion of Francis' trial, the prosecutor in petitioner's case requested the video tape, and it was ordered to the custody of the San Mateo County Sheriff's Department.

1    Respondent moves for summary judgment on the grounds that petitioner fails to

2    demonstrate that the video would have been exculpatory.  He asserts that the state court

3    reasonably denied this subclaim.  Petitioner fails to address respondent's arguments.

4        Respondent is correct.  Petitioner does not specify how the video tape would have

5    exculpated him, and in fact concedes (Am. Pet. at 101) that he cannot show prejudice resulting

6    from the prosecution's withholding of this evidence.  Moreover, as stated in the discussion of

7    subclaim 9(H) above, Francis' video would probably have been excluded in state court as being

8    inherently unreliable.  *See Jones*, 52 Cal. 2d at 653.  This subclaim lacks merit.

9        The state court denial of this subclaim was not objectively unreasonable.

10   Summary judgment on claim 18(D) is **GRANTED** in favor of respondent.

11                    *(5)*        ***Subclaim E.***

12       Petitioner faults the prosecution for failing to disclose the existence of an agreement with

13   their witness Michael Shing which led to the dismissal of charges against him in exchange for

14   his testimony at trial.  Furthermore, he asserts that Shing's probation was not revoked despite the

15   fact that his pending rape charge constituted a violation of his probation.  This subclaim mirrors

16   many of the allegations contained in subclaim 9(G), discussed above.

17       Respondent moves for summary judgment on the grounds that petitioner has failed to

18   produce any evidence of the existence of such an agreement.  He asserts that the state court

19   reasonably denied this subclaim.  Petitioner fails to address respondent's arguments.

20       Respondent is correct.  As noted in the discussion of subclaim 9(G), petitioner presents

21   no evidence that the alleged agreement between Shing and the prosecution existed.  In fact, as

22   petitioner himself recognizes, the prosecution explicitly denied petitioner's allegations.

23   Moreover, on cross-examination, Shing admitted that he received approximately $10,000 in

24   exchange for his testimony.  The existence of any further deals with the prosecution is purely

25   speculative.

26       The state court denial of this subclaim was not objectively unreasonable.

27   Summary judgment on claim 18(E) is **GRANTED** in favor of respondent.

28

United States District Court

For the Northern District of California

### (6)    *Subclaims F, G, H.*

In subclaims F, G and H, petitioner alleges that the prosecution failed to disclose evidence of petitioner's incompetence, psychological decomposition, and of Michael Francis' mental illness.  Respondent does not address these subclaims in his motion.

Petitioner fails to demonstrate that the evidence cited in these subclaims would have been exculpatory.  The state court denial of these subclaims was not objectively unreasonable.  Accordingly, subclaims 18(F), (G) and (H) are **DISMISSED**.

### M.    Claim 33.

Petitioner alleges that his penalty determination was unconstitutionally unreliable due to counsel's failure to object to numerous errors during the guilt phase of trial.  With respect to these errors, he alleges that:  (1) Livingston's role and credibility were distorted by her plea bargain, the jury instructions regarding the evaluation of her role as an accomplice, and her restricted cross-examination, (2) the trial court's admission of Michael Francis' hearsay statement implicating petitioner in Barrett's homicide, and its failure to sua sponte instruct on accomplice liability denied petitioner a reliable determination of his responsibility for Barrett's death, (3) the court erred in admitting Angel Burns' statements implicating petitioner in the Oakden and Fravel murders, (4) the erroneous admission at trial of petitioner's statements to the police allowed the jury to factor into its decision illegally obtained evidence regarding his involvement in the Searcy, Thomas, Melendrez and Oakden homicides, and (5) numerous instances of prosecutorial misconduct during the guilt-phase closing arguments deprived him of his right to an accurate determination of guilt.  Petitioner asserts that to the extent that these errors were the result of counsel's failure to object or present proper argument, he was denied the effective assistance of counsel.  Petitioner presented this claim to the Supreme Court of California in his state habeas petition.  The state court denied it without a reasoned opinion (Pet.'s Exh. C-6).

Respondent moves for summary judgment on the grounds that this Court has already affirmed the state court's rejection of a number of petitioner's underlying claims in its order of

**United States District Court**
For the Northern District of California

1   June 15, 2006.  He asserts that the state court reasonably denied the entirety of this claim.

2   Petitioner fails to address respondent's arguments.

3   Respondent is correct.  The order of June 15, 2006, rejects the bulk of petitioner's

4   allegations in subclaims 1–3.  With respect to subclaim 4, the Supreme Court of California

5   reasonably found that petitioner's statements to the police were properly admitted.  *See Sully*,

6   53 Cal. 3d at 1233–34.  With respect to subclaim 5, petitioner's allegation of prosecutorial

7   misconduct during closing argument lacks specificity and must be rejected.  *See Jones*, 66 F.3d

8   at 204.  In the absence of underlying error, petitioner's claim lacks merit.

9   The state court denial of  this claim was reasonable.  Summary judgment on claim 33 is

10  **GRANTED** in favor of respondent.

11  **N.      Claim 34.**

12  Petitioner alleges that the state court erroneously allowed into evidence statements

13  petitioner made to police officers on the night of his arrest for the murder of Barbara Searcy.

14  He claims that these statements were obtained without a proper waiver of his constitutional

15  rights as required by *Miranda v. Arizona*, 384 U.S. 436 (1966).  Petitioner presented this claim to

16  the Supreme Court of California in his state habeas petition.  The state court denied it without a

17  reasoned opinion (Pet.'s Exh. C-6).

18  Respondent moves for summary judgment on the grounds that the state court reasonably

19  denied this claim.  Petitioner fails to address respondent's arguments.

20  In addressing this claim on direct appeal, the Supreme Court of California stated:

21      Following his arrest, defendant gave a tape-recorded statement to
        Detective Sergeant Robert Morse.  Before questioning defendant,
22      Morse admonished him of his rights under *Miranda v. Arizona*
        (1966) 384 U.S. 436.  Asked if he understood his rights, defendant,
23      a former police officer, responded, "Yes, I do."  Finding a waiver
        of Miranda rights, the court admitted defendant's statement in
24      evidence.

25      Defendant challenges the finding of waiver.  As he acknowledges,
        we have upheld such a finding under similar circumstances in
26      *People v. Johnson* (1969) 70 Cal.2d 541, 556–558.  *Johnson*
        remains good law on this point; the court's finding of waiver was
27      justified by the undisputed facts, *i.e.*, that defendant, a former
        police officer, was informed of his *Miranda* rights, expressly
28      affirmed his understanding of those rights, and then proceeded to
        answer questions and to make statements he knew were being

United States District Court

For the Northern District of California

1    tape-recorded.  (*See North Carolina v. Butler* (1979) 441 U.S. 369,
     375-376, fn. 6.)  Defendant's challenge is rejected.

2    *Sully*, 53 Cal. 3d at 1233 (internal citations omitted in part).

3        The Supreme Court of California reasonably applied Supreme Court precedent in

4    denying petitioner's claim.  In *North Carolina v. Butler*, 441 U.S. 369, 375–76 (1979), the

5    Supreme Court held that an explicit waiver is not necessary for a finding that a defendant waived

6    the right to remain silent or the right to counsel guaranteed by *Miranda*.  Here, petitioner, a

7    former police officer, did not object to speaking to police officers.  He had been advised of his

8    rights and knew that his statements were being tape-recorded.  Although there was no express

9    waiver, such waiver was not required.  The state court's denial of petitioner's claim was not

10   objectively unreasonable.

11       For the above-mentioned reasons, summary judgment on claim 34 is **GRANTED** in favor

12   of respondent.

13               **O.    Claim 35.**

14       Petitioner alleges that his constitutional rights under *Massiah v. United States*, 377 U.S.

15   201 (1964), were violated when San Francisco police officers interrogated him regarding the

16   barrel murders outside the presence of counsel.  At the time, petitioner had been arraigned on

17   Barbara Searcy's murder charge and had accepted appointment of counsel.  He asserts that the

18   officers's interrogation interfered with his right to counsel on the Searcy charge.  He further

19   claims that the trial court erroneously ruled that the officers had acted appropriately and allowed

20   the prosecution to present the taped interview to the jury.  Petitioner presented this claim to the

21   Supreme Court of California in his state habeas petition.  The state court denied it without a

22   reasoned opinion (Pet.'s Exh. C-6).

23       Respondent moves for summary judgment on the grounds that the state court reasonably

24   denied this claim.  Petitioner fails to address respondent's arguments.

25       In addressing this claim on direct appeal, the Supreme Court of California stated:

26           After defendant was arraigned on the Searcy murder charge and
             counsel was appointed to represent him, Inspectors Schneider and

27           Mullane of the San Francisco Police Department interviewed
             defendant in connection with the Golden Gate Park barrel murders.

28           The record reveals the inspectors knew defendant was in custody
             on the Searcy charge, but did not know whether he had been

56

United States District Court

For the Northern District of California

arraigned or had requested or obtained counsel as to that charge. After receiving a full *Miranda* admonition, defendant waived his rights and gave a tape-recorded statement. Following a hearing at trial, the court admitted the statement.

Defendant challenges the trial court's ruling, asserting a violation of his Sixth Amendment rights under *Massiah v. United States* (1964) 377 U.S. 201. The rule of *Massiah,* however, applies to attempts to procure incriminating statements regarding the formal charges made against a defendant; a defendant has a Sixth Amendment right to counsel *only as to those charges.* (*People v. Hovey* (1988) 44 Cal.3d 543, 561.) "Incriminating statements pertaining to other crimes, as to which the Sixth Amendment right has not yet attached are, of course, admissible at a trial of those offenses." (*Maine v. Moulton* (1988) 474 U.S. 159, 180, fn.16.) Thus, defendant's argument is effectively limited to an assertion that his uncounseled statement with respect to the barrel murders materially interfered with his right to representation on the Searcy murder charge. (*In re Michael B.* (1981) 125 Cal. App. 3d 790, 796–797.) On the record before us, the assertion cannot be supported.

Initially, we observe that full *Miranda* warnings were given and defendant's statement was voluntarily made after a waiver of his *Miranda* rights. Although these factors are not dispositive in a Sixth Amendment context, they are important considerations that cut against defendant's argument. (In re Michael B., supra, 125 Cal. App. 3d at p.795.) Moreover, the facts of the Searcy murder are not "so inextricably enmeshed that factually and conceptually it was virtually impossible to distinguish the events." (*In re Michael B*., supra, 125 Cal. App. 3d at p. 797.) Although there was unquestionably a pattern to defendant's crimes, they involved distinct events, different victims, and different times. There were differences among the offenses in material witnesses and physical evidence. Defendant does not show how, if at all, police interrogation and his statement about the barrel murders interfered with his right to counsel as to the Searcy crime. In the absence of such a showing, we reject his assignment of Sixth Amendment error.

Moreover, although defendant does not explicitly rely on Fifth Amendment grounds, we perceive no support for a Fifth Amendment argument here. As we have observed, defendant freely and voluntarily waived any Fifth Amendment right he may have had; moreover, defendant's appearance and acceptance of appointed counsel on one charge does not amount to an invocation of such rights with respect to another, uncharged offense. (*Connecticut v. Barrett* (1987) 479 U.S. 523.)

Finally, any alleged error in admitting the statement was harmless beyond a reasonable doubt. In his statement, defendant denied all knowledge of the barrel murders. Although he did make some remarks later used by the prosecutor to impeach his testimony at trial, this limited impeachment did not play a substantial role in defendant's conviction. The testimony of other witnesses, as well

as physical evidence, constituted overwhelming proof of
defendant's guilt.

*Sully*, 53 Cal. 3d at 1233–34 (internal citations omitted in part).

The Supreme Court of California reasonably denied this claim.  A *Massiah* violation

occurs when the state obtains incriminating statements by knowingly circumventing the

accused's right to have counsel present in a confrontation between the accused and a state agent.

*Maine v. Moulton*, 474 U.S. 159, 176 (1988).  A defendant's Sixth Amendment right, however,

is offense-specific, and does not attach until the commencement of a prosecution.  *See id*. at 180

n.16 ("incriminating statements pertaining to other crimes, as to which the Sixth Amendment

right has not yet attached are, of course, admissible at a trial of those offenses").  Here, petitioner

had been appointed counsel *in relation to the Searcy charge*, but was interrogated in relation to

the separate barrel murders.  Petitioner fails to demonstrate that the facts of the barrel murders

were so intertwined with the facts of Searcy's murder that the interrogation with respect to the

former interfered with his right to counsel in connection with the latter.  Petitioner's claim lacks

merit.

For the above-mentioned reasons, summary judgment on claim 35 is **GRANTED** in favor

of respondent.

## P.     Claim 36.

Petitioner alleges that he was denied due process and the right to present witnesses on his

behalf as a result of law enforcement officers' harassment and intimidation of potential defense

witnesses.  He alleges that detectives investigating his case informed "one female witness" who

had been friends with petitioner that she was fortunate she was not one of petitioner's victims.

He further asserts that law enforcement officers conducted improper questioning and utilized

tactics calculated to intimidate "several potential defense witnesses."  Petitioner presented this

claim in his state habeas petition.  The California Supreme Court denied it without a reasoned

opinion (Pet.'s Exh. C-6).

Respondent moves for summary judgment on this claim on the grounds that petitioner's

allegations lack sufficient detail to adjudicate on the merits and are devoid of evidentiary

support.  He claims that the Supreme Court of California reasonably denied petitioner's claim.

58

United States District Court

For the Northern District of California

1    Respondent is correct.  Conclusory allegations which are not supported by a statement of

2    specific facts do not warrant habeas relief.  *Jones*, 66 F.3d at 204.  Petitioner's allegations fail to

3    demonstrate how the alleged law enforcement actions affected the unnamed witnesses or

4    prejudicially affected the fairness of the trial.  Petitioner's claim lacks merit.

5    The state court decision with respect to claim 36 was not objectively unreasonable.

6    Summary judgment on this claim is **GRANTED** in favor of respondent.

7    **Q.    Claims 37.**

8    Petitioner alleges that he was denied the effective assistance of appellate counsel.

9    He alleges that counsel was ineffective for failing to file his state habeas petition and for failing

10   to investigate and expose trial counsel's ineffectiveness and various other unspecified prejudicial

11   errors.  Petitioner presented this claim in his state habeas petition.  The California Supreme

12   Court denied it without a reasoned opinion (Pet.'s Exh. C-6).

13   Respondent moves for summary judgment on this claim on the grounds that vague,

14   conclusory and speculative allegations do not warrant habeas relief.  He contends that the

15   California Supreme Court reasonably denied this claim.  Petitioner does not address respondent's

16   allegations in his opposition.

17   The Court agrees with respondent.  Summary judgment on claim 37 is **GRANTED** in favor

18   of respondent.

19   **R.    Claims 39.**

20   Petitioner alleges that the cumulative effect of the errors contained in his petition resulted

21   in an unconstitutional conviction and sentence.  Petitioner presented this claim in his state habeas

22   petition.  The California Supreme Court denied it without a reasoned opinion (Pet.'s Exh. C-6).

23   Respondent moves for summary judgment on this claim on the grounds that the

24   California Supreme Court reasonably denied this claim.  He asserts that although the Ninth

25   Circuit has recognized the concept of cumulative error as a separate basis for habeas relief,

26   *see Daniels v. Woodford*, 428 F.3d 1181, 1214 (9th Cir. 2005), the United States Supreme Court

27   has never affirmatively granted habeas relief on this ground.  Petitioner fails to address

28   respondent's arguments in his opposition.

1    The Court agrees with respondent.  Summary judgment on claim 39 is **GRANTED** in favor

2    of respondent.

3                                    **CONCLUSION**

4    This order concludes petitioner's federal habeas proceedings.  In adjudicating the instant

5    motion for summary judgment, the Court has carefully reviewed the record and has fully credited

6    petitioner's evidentiary proffer, including the declarations of Dr. Woods, Dr. Grossi, Dr. Elin, as

7    well as numerous other exhibits submitted in support of the petition.  In so doing, it has

8    determined that the California Supreme Court's denial of petitioner's claims was not objectively

9    unreasonable, and that respondent is entitled to judgment as a matter of law.

10    Furthermore, because petitioner's claims can be resolved by reference to the record and

11    the record precludes habeas relief, an evidentiary hearing is not required.  *See Schriro v.*

12    *Landrigan*, 127 S. Ct. 1933, 1940 (2007); *see also Totten v. Merkle*, 137 F.3d 1172, 1176

13    (9th Cir. 1998) (affirming the denial of an evidentiary hearing where the applicant's factual

14    allegations flew in the face of logic in light of the applicant's acts, which were discernible

15    from the record); *Anderson v. Attorney General of Kan*. 425 F.3d 853, 858–59 (5th Cir. 2005)

16    (no evidentiary hearing is required if applicant's allegations are contravened by the existing

17    record).  Here, in relation to claim 3 in particular, there is ample evidence in the record that

18    mitigation evidence of petitioner's mental impairment and chronic substance abuse would have

19    been too inconsistent with his testimony and supporting defense of factual innocence to be

20    viable, and was unlikely to alter the jury's verdict.  Prejudice is foreclosed on this particular

21    record.

22    This accords with the AEDPA's purpose to reduce delays in the execution of criminal

23    sentences.  *Landrigan*, 127 S. Ct. at 1940.  If district courts were required to allow habeas

24    applicants to develop insubstantial factual allegations in evidentiary hearings, they would be

25    forced to reopen factual disputes that were conclusively resolved in the state courts.  *Ibid*.

26    As noted at the outset, the murders in question occurred a quarter-century ago.  The death verdict

27    was rendered 21 years ago.  Defense counsel is dead.  Petitioner's extended challenge to his

28    conviction and sentence, at least in this forum, is now over.

1

2

3

       For the foregoing reasons, respondent's motion for summary judgment with respect to claims 3, 4, 5, 6, 7, 8, 9, 10, 11, 14, 17, 18, 33, 34, 35, 36, 37, and 39 is **GRANTED** in favor of respondent, all other claims having previously been rejected.  Final judgment will be entered.

4

5

       **IT IS SO ORDERED.**

6

7

Dated:  May 20, 2008.

8

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California